**KEDDIE RESORT, Inc.,**

v.

**The UNITED STATES.**

No. 17874.

United States Court of Claims.

Nov. 30, 1954.

Walter J. Little, Los Angeles, Cal., for plaintiff. Richard N. Little, Los Angeles, Cal., was on the brief.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

This case is before us pursuant to a Resolution of the House of Representatives, which Resolution is quoted in full in finding 3.

In 1931 the Western Pacific Railroad Company completed its line between Bieber and Keddie, California, in the mountains in Plumas County. Keddie was made a freight division point on the railroad, and arrangements were made for living quarters for the train crews. There were available an old hotel and three or four small cabins. Mr. Charles Rihm was brought to Keddie as general manager of the hotel. He and another person bought some of the townsite land. In 1933, two men who were contractors for the railroad bought out the interest of the other person and the plaintiff corporation was formed, Mr. Rihm owning 50 percent of the stock and the two contractors, who were made president and secretary of the corporation, owning the other 50 percent.

The plaintiff corporation built up the town of Keddie so that it had a large hotel, a store, a bar, a post office and some 40 housing units. The railroad owns some of the land and some of the houses, which it leases to the plaintiff company. In 1933 the plaintiff acquired a 160 acre tract of unimproved land known as Maxwell Ranch. The plaintiff built a building costing some $8,000 on the highway near the town. The building housed a gas station, a garage, a soda fountain, a showroom and living quarters.

By the year 1943 there was a shortage of housing for railroad employees in Keddie. The Federal Public Housing Authority desired to erect a war housing project there. The San Francisco regional office of the Authority sent a crew of planners there. They told Mr. Rihm that it was planned to erect a 30-unit

housing project. He showed the crew over the Maxwell Ranch land, and showed them a small stream and some springs. Mr. Rihm offered to give the Government the use of the land free, for the purpose indicated. But he said he wanted to tie into the water system. In later negotiations he said that he wanted the right to buy the improvements on the land when the Government was through with them, and wanted the lease to terminate at the end of the war.

A Mr. Bolla was the appraiser and negotiator on the Government crew that first went to Keddie. He told the plaintiff, in response to the plaintiff's request for the right to connect into the water system that the Government would build, that the plaintiff might do so. Whether they were talking about the plaintiff's getting water only for the building which housed the gas station, garage, etc., or for a more extensive use, the evidence does not show. The plaintiff was told that he could not be given the right to buy the buildings at the end of the lease, but that the underground utility installations would be left in the ground.

When the lease was written, it provided for rent of one dollar a year, for its termination "one year after the termination of the existing national emergency", and for the underground pipes, sewer facilities and other utilities to remain the property of the lessor. Mr. Bolla, in his report to his superiors on his visit to Keddie and his conversation with Mr. Rihm, did not mention the matter of the plaintiff's connecting into the Government's water system, and the lease did not mention it. It was submitted to the plaintiff's president and secretary for signature. Mr. Rihm was not present, but he by telephone instructed the officers to sign it. It was in due course accepted by the Government.

The Government built a 30-unit housing project, consisting of seven buildings, containing 20 3-bedroom and 10 2-bedroom apartments, a community building, a sewerage system with septic tanks and a drainage field, and a water system. The water system took water from a ravine containing a flowing stream fed by springs. The stream was dammed and a 6,000 gallon reservoir was thereby created. A 2-inch pipe from the reservoir led to a 20,000 gallon redwood tank, from which the water was piped some 2,000 feet to the houses and fire hydrants.

Mr. Rihm asked the manager of the housing project for permission to connect into the water system and the manager told him that he had no authority to permit him to do so.

The housing project was fully occupied by the middle of 1944, and continued to be so until late in 1951, when a few vacancies developed. The manager of the project was diligent in trying not to compete with the plaintiff's housing accommodations.

In 1947 Mr. Rihm acquired all the stock of the plaintiff corporation, some of it being in his wife's name. He began then to try to prevent the Government's project from competing with his housing; to obtain the right to connect into the water system, and to terminate the lease and secure the buildings, in place, if possible. Because of Mr. Rihm's demands for connection with the water system, the feasibility of doing so was investigated and it was rightly concluded that the water supply was insufficient.

On December 3, 1948, at 4 o'clock in the morning the plaintiff's gas station building was completely destroyed by fire. The people who lived in one end of the building were obliged to flee in their night clothes into the bitter cold night. The people in the other end of the building had time to dress themselves and save some of their possessions. We have made a finding that, at the time and in the circumstances, no substantial part of the building or its contents could have been saved if the plaintiff had been permitted to connect into the Government's water system.

The Government spent $104,769.58 on the housing project and its furnishings. At the end of 1951, when the lease was terminated, the plaintiff bought the houses and furnishings, for $12,500.

The plaintiff urges that the Government was bound by contract (1) to permit the plaintiff to connect into the Government's water system, (2) to so conduct its housing facilities that they would not compete with those of the plaintiff, and (3) to vacate the premises one year after the end of the war, *i. e.,* on December 31, 1947, which was one year after the termination of hostilities was proclaimed by the President.

■ As to the first claim, relating to the water system, we have found that the loss of the plaintiff's building was not caused by the lack of connection with the water system; that the fire which consumed the building would have done so regardless of the controverted connection.

■ The second claim is that the Government agreed not to compete with the plaintiff. Such an agreement could not have meant more than that the managers of the Government project would not accept tenants who desired to move out of the plaintiff's houses, and would not purposely attempt to secure tenants for whom the plaintiff had appropriate facilities. When one who is in the housing business himself arranges for the Government to build and operate a housing project on land near his own houses, he does not expect that the Government's tenants will be evicted whenever he has a vacancy in one of his houses. A certain amount of unintended competition was inevitable, and must have been contemplated by Mr. Rihm when he arranged for the lease. Then, too, several of the plaintiff's apartments in which extensive vacancies occurred were one-bedroom apartments, of which there were none in the Government's project. As to these, there could hardly be said to have been competition.

Our conclusion is that the Government project did not compete with the plaintiff's housing to any greater extent than was inevitable from the very existence of the Government's project, and was contemplated by the plaintiff when it made the lease.

As to the plaintiff's claim that the Government agreed that the lease should terminate one year after the end of the war, we have found that Mr. Bolla, the Government's representative, told Mr. Rihm in their first conversation that the lease would be written to terminate two years after the end of the war. Mr. Rihm objected to that and Mr. Bolla said he would try to get a provision inserted reducing the period to one year after the war. Mr. Bolla made no report of this conversation. The lease, as written by his superiors, provided for its termination "one year after the termination of the existing national emergency". The lease was presented for signature to the plaintiff's president and secretary, each of whom owned 25 percent of the plaintiff's stock. They had been requested by Mr. Rihm by telephone to execute a lease. The plaintiff presented no evidence that these officers had been told of the oral statements of Mr. Bolla, or that there was any discussion between them and the Government's representatives of the subjects about which Mr. Bolla had made statements, and which are the subjects of the plaintiff's present claims. The situation then was that Mr. Bolla, who had no authority to do so, had stated to Mr. Rihm that he would try to get a provision inserted that the lease would terminate one year after the end of the war; that Mr. Bolla did not report this conversation to those who had authority to agree on the terms of leases; that Mr. Rihm did not report the conversation to the officers of the plaintiff who had to sign the lease, but told them to execute a lease, which they did, and which did not contain the provision discussed in the conversation. It contained, instead, a provision for termination "one year after the termination of the existing national emergency." The plaintiff does not contend that the existing national emergency, so far as applicable to housing, had terminated when the Government and the plaintiff, by agreement, terminated the lease on December 31, 1951.

■ No valid agreement for a termination of the lease one year after the end of the war can be spelled out of the facts recited above. Even Mr. Bolla, who had no authority to bind the Government as to what were to be the terms of the lease, did not agree or represent that this would be a term of the lease. He said he would try to get it put in. He thus showed that the authority was in other persons.

The evidence, taken as a whole, indicates that Mr. Rihm's principal object in regard to the lease was to get it signed, and get the project built by the Government on the plaintiff's land. He was the manager and the principal stockholder of the plaintiff. He requested the authorized officers of the plaintiff to sign "a lease" without indicating to them that they should read it with care to see whether certain provisions, the importance of which he now insists upon, were in it. He did not request that they telephone him when the lease was presented to them, or that they ask the Government's representatives to telephone him.

Mr. Rihm was right in thinking that the main thing about the lease was to get it signed and get the housing built on the plaintiff's land, with the Government's money. It would enlarge and improve the town, which was largely owned by the plaintiff. It would, at worst, leave on the land after a few years, valuable and useful utility installations at no cost to the plaintiff. In addition, it would probably leave the houses themselves available for acquisition at a bargain, since, located where they were to be, the removal of the houses or the salvaging of the materials in them would be quite uneconomical.

All of what Mr. Rihm must have foreseen came true. He was wise not to quibble about the terms of the lease, and to keep his attention on the fact of "a lease".

Our conclusion is that the plaintiff has no claim, legal or equitable, against the United States.

This opinion and the findings of fact, together with the conclusions thereon, will be certified to Congress pursuant to House Resolution 461, 82d Congress, 1st Session.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.

### Findings of Fact

The court, having considered the evidence, the report of Commissioner Roald A. Hogenson, and the briefs of counsel, makes findings of fact as follows:

1. The plaintiff is a California corporation with its principal place of business at Keddie, California.

2. On May 28, 1951, H. R. 4290, 82d Congress, 1st Session, was introduced in the House of Representatives, to authorize and direct the Secretary of the Treasury to pay $50,000 to the plaintiff in full settlement of all claims (a) arising out of a lease entered into on August 2, 1943, whereby the United States leased from the plaintiff certain land at Keddie, California, to establish a war housing project, and (b) on account of losses sustained by the plaintiff as a result of the operation of the project.

3. House Resolution 461, 82d Congress, 1st Session, passed on October 18, 1951, provided:

"*Resolved*, That the bill (H.R. 4290) entitled 'A bill for the relief of Keddie Resort, Incorporated,' together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant."

4. From the organization of the plaintiff corporation in 1933 until 1947, Mr. Charles Rihm owned 50 percent of its corporate stock and was its vice-president and general manager. The remaining one-half interest was owned equally by Mr. Joseph Gerrick and Mr. Irving Gottheim, who served respectively as president and secretary. Since 1947 Mr. Rihm and his wife have owned all of the stock of the plaintiff company.

5. The major assets of the plaintiff corporation consisted of land comprising the Keddie townsite, improved with an 18-room hotel, 34-room annex, about 40 cottages, and other necessary buildings, such as a store, garages, and a post office. A small part of the land upon which about nine of the cottages were constructed was leased from the Western Pacific Railroad Company.

6. The village of Keddie was established in the mountains in Plumas County, California, in 1931 when the Western Pacific Railroad Company completed its line between Bieber and Keddie, and the latter became a freight division point. In that year Mr. Rihm purchased the townsite. The improvements then consisted of the hotel and 3 or 4 small shacks.

The plaintiff company acquired the Keddie townsite and improvements in 1933, and also purchased a 160-acre tract of unimproved land known as the Maxwell ranch.

The plaintiff's facilities at Keddie were used almost exclusively for the housing of employees of the Western Pacific Railroad Company. The plaintiff and the railroad company had reached an agreement to give priority to such persons.

7. The Maxwell ranch was separated from the Keddie townsite by the Feather River Highway, extending north and south at that point. Running next to the road on the Keddie side was a stream known as the Spanish Creek.

The plaintiff's community was about 400 yards east of the highway. The defendant's war housing project was constructed on the west side of the highway on a part of the Maxwell ranch at a distance of about 600 to 700 yards from Keddie.

8. At a point on the Maxwell ranch on the same side of the highway and adjacent to the site of the defendant's project, the plaintiff owned and operated a building which provided a gas station, garage, soda fountain, living quarters, and a showroom. This building was of split-log and slab construction, and had been erected at different intervals and in different sections by Mr. Rihm.

9. During and prior to 1943 a substantial shortage of housing for railroad employees developed in and about the area of Keddie. The San Francisco regional office of the then Federal Public Housing Authority received directions from Washington, D. C., to obtain a site for a war housing project at Keddie. The regional office sent out a crew of project planners who called on Mr. Rihm at Keddie sometime in the spring of 1943. Mr. Rihm and the crew inspected possible sites on the Maxwell ranch. The site eventually leased was discussed at length, and it was explained to Mr. Rihm that a 30-unit project would probably be constructed to provide emergency housing for railroad employees.

Mr. Harold Bolla, appraiser and negotiator, Land Division, Federal Public Housing Authority, was one of the project planners assigned out of the regional office. His duties were to investigate, appraise and negotiate for the acquisition of land for housing projects. He told Mr. Rihm that the project would be used to house railroad employees as a part of the war program of expediting transportation of materials and troops, and that it would be operated in such a manner as not to compete with the plaintiff's rental facilities.

10. During the discussion with the project planners, Mr. Rihm stated that he wanted to cooperate in the war effort and that the Government could use the project site without charge. Mr. Bolla explained that the lease would have to provide for a nominal consideration.

Mr. Rihm stated to Mr. Bolla that he wanted to hook onto the project water

system as soon as possible, and explained that the Maxwell ranch had been purchased because of its water supply. He said that he wanted to supply water to the gas station and facilities located in the building adjacent to the project site. Mr. Bolla consulted with one of the project planners, inspected the sources of the water supply, concluded that there was more water available than required for the project, and told Mr. Rihm he could connect onto the system.

11. Mr. Rihm and Mr. Bolla also discussed the matter of the time of termination of the lease. Mr. Bolla stated that it would be "two years after the war," to which Mr. Rihm objected, and Mr. Bolla said he would try to have the time reduced to one year.

Mr. Rihm and Mr. Bolla also agreed that a clause would be inserted in the lease providing that the plaintiff would be entitled to the underground utilities upon the termination of the lease. Mr. Bolla further advised Mr. Rihm that there could be no provision regarding sale or transfer to the plaintiff of the other improvements.

12. Mr. Bolla had authority only to negotiate for and take the offer or proposal of a property owner to the regional office of the Federal Public Housing Authority for consideration.

He lacked authority to make representations or to enter into agreements concerning the terms of Government leases, and he had no authority to make representations to the plaintiff concerning the time of termination of the lease, or the use of the project water system by the plaintiff, or the matter of competition between the defendant's project and the plaintiff's rental facilities.

The question of Mr. Bolla's authority was not mentioned in the discussion between him and Mr. Rihm. Mr. Rihm had no other negotiations or meetings with any Government representative until several months after the execution of the lease.

13. Under date of June 5, 1943, Mr. Bolla prepared and filed a cursory report on the proposed Keddie project with his immediate superior, the Regional Land Adviser, Federal Public Housing Authority, at San Francisco. He made no mention of his statements to Mr. Rihm about water connection, competition between rental facilities, or the time of termination of the lease.

As was the regular procedure in cases of land acquisition, the lease was prepared on a printed form in the office of the Regional Land Adviser, submitted to the plaintiff for signature, approved by the Regional Director, and then forwarded to Washington, D. C., for the signature of the Commissioner, as head of the Authority. If the lessor requested a reasonable provision, it would be inserted before the lease was sent to Washington for final approval and execution.

14. The lease was duly executed in behalf of the plaintiff by its president and its secretary at San Francisco. Mr. Rihm was not present at the signing of the document, nor was he aware of the terms thereof. He had telephoned one of the other officers and requested the execution of a lease.

As shown in Finding 15, certain interlineations in the printed form of the lease were made and marked "I. G.," probably the initials of Irving Gottheim, the plaintiff's secretary. Otherwise, there is no evidence bearing on the extent to which the plaintiff's president and secretary were advised of the oral statements made by Mr. Bolla, or the extent, if at all, to which those matters were discussed between them and any Government representative. It is not shown that any request was made that the printed lease form be amended to provide terms concerning the plaintiff's obtaining water from the defendant's project system, or concerning the elimination of competition between the plaintiff's and the defendant's housing facilities, or that anything was said about the meaning of the termination clause.

15. Under date of August 2, 1943, the plaintiff, as lessor, and the defendant, acting by and through its Federal Public Housing Commissioner, as lessee, enter-

ed into written lease designated as Cal 4716–Keddie, by the terms of which the plaintiff leased for one year commencing on July 7, 1943, at a rental of $1.00 per year, 15.991 acres of its Maxwell ranch to the defendant for construction of a project to house persons engaged in national defense activities.

The lease made no provision for permitting the plaintiff to obtain water from the project system, nor did it contain any statement concerning competition between rental facilities.

Pertinent provisions of the lease are as follows:

"4. This Lease shall be automatically renewed from year to year at the same rental and upon the same terms and conditions, unless the Government shall give the Lessor written notice of its intention not to renew at least sixty (60) days prior to the end of the original term of this Lease or any renewal thereof; provided that no such renewal shall, without the consent of the Lessor, extend beyond ~~three~~ *one I. G.* years after the termination of the existing national emergency. [Italics supplied.]

"5. During the term of this Lease and any renewal thereof, the Government, as an additional consideration under this Lease, shall pay to the Lessor amounts equal to the amounts of taxes, without interest or penalties thereon, which are levied for the period covered by the term of this Lease and any renewals thereof against the Premises and all improvements thereon. Such payments shall be made to the Lessor upon submission to the Government of receipts showing payment of such taxes in full, provided that the Government may, at its option make such payments on behalf of the Lessor directly to the public official authorized to collect such taxes. If such taxes shall include any amounts levied upon structures, alterations or additions upon the Premises erected by the Government, the taxes shall not be paid by Lessor, but the tax bill shall be promptly submitted to the Government for disposition.

\* \* \* \* \* \*

"7. The Government shall have the right to make alterations, erect, install and maintain additions and structures and attach fixtures to the Premises and make any and all improvements thereto, including utilities and roads. All such alterations, additions, structures, fixtures and improvements shall be and remain the property of the Government and may be removed from the Premises by the Government prior to or within a reasonable time after the expiration of this Lease, *except all underground pipes, sewer facilities and other utilities shall belong to lessor and remain on the property of Lessor. I. G.* [Italics supplied.]

"8. The Government may terminate this lease at any time during the original term or any renewal thereof by giving to the Lessor sixty (60) days written notice of such intention to terminate. In the event of such termination, the installment of rent payable for the period during which the termination occurs shall be prorated."

The italicized words in paragraphs 4 and 7 represent the language added to the printed form of the lease.

16. The defendant thereafter constructed a 30-unit housing project, consisting primarily of seven buildings containing 10 two-bedroom and 20 three-bedroom units, a community building, a sewage disposal system, and a water system.

17. The defendant's water system commenced on the leased land in a ravine containing a flowing stream fed by springs. The defendant constructed a dam and created a 6,000-gallon reservoir. A small spillway on the dam was provided for excess water. A 2-inch pipe carried the water from the reservoir into a 20,000-gallon redwood tank, located about 230 feet from the dam. The water

from the tank ran through a 6-inch pipe for 1,545 feet, then through a 4-inch pipe for 283 feet to the first fire hydrant on the project, and thereafter through a 2-inch pipe for 200 feet to the second and last fire hydrant. Various 1¼-inch lateral pipes were provided from the 2-inch section of the main line. The piping from the tank to the second fire hydrant was cast iron.

The shortest distance from the plaintiff's gas-station building to the defendant's second fire hydrant, which was the closest point on the main line, was about 400 feet.

The drop in elevation was 24 feet from the level of the dam to the tank, and 113 feet from the top of the tank to the end of the main line at the second fire hydrant, which was 55 feet higher than plaintiff's gas station.

18. Commencing with the completion of the construction of the defendant's housing project, Mr. Rihm on several occasions requested permission of the defendant's local manager to connect onto the project water system. The manager advised that he lacked authority to consider the matter. In 1947 Mr. Rihm began to call upon officials at the San Francisco regional office, and he made repeated complaints to them that he had been promised the right to tie into the project water system as a part of the consideration for the rental of the plaintiff's property.

At no time was the plaintiff ever granted permission to connect onto the project system.

19. During the war period, there were critical shortages of water pipe, and piping was conserved whenever possible in the design of the defendant's war housing projects. No offsite extensions beyond the needs of the project were permitted.

The defendant's Keddie project was redesigned to conserve pipes to the extent that piping was reduced in size in some particulars.

20. By reason of the requests made by Mr. Rihm, the regional office sent Mr. Robert F. Johnson to the project in the early fall of 1948 to investigate the feasibility of permitting the plaintiff to use the defendant's water system. He found that there was only an 18-inch supply of water in the storage tank at 3:00 o'clock in the afternoon. He concluded that the water supply was insufficient to provide fire protection to the Government project. He recommended to the regional office that permission to the plaintiff should be granted only on the basis that further development work on the water system be done at no expense to the Government.

In October 1948 the regional office sent Mr. Victor E. Johnson, a graduate civil engineer, to investigate the water supply. He observed that water was running at maximum flow through the 2-inch pipe from the reservoir into the tank, or at a rate of 40 to 50 gallons per minute, and also that ⁹⁄₁₆ of an inch of water was running over the dam spillway, which flow was about 30 gallons per minute.

On one occasion during hot and dry weather when large amounts of water had been used to water lawns about the project buildings, the water supply failed, and only a trickle of water came through the system. However, there were only one or two occasions when water failed to run over the dam.

While there was an ample flow of water in the ravine for further development, that is, by increasing the size of the reservoir and tank facilities, the existing water system was insufficient to provide fire protection and domestic water to both the defendant's project and the plaintiff's gas-station building. During dry seasons, the water system was inadequate for the defendant's project alone.

There was considerable other water available for the project on the Maxwell ranch. There were supplies of water which the plaintiff could have developed and used.

21. On December 3, 1948, at about 4:00 a. m., the plaintiff's gas-station building was completely consumed by fire.

There were two families housed in this building. The Weiland family lived at one end. Mr. Weiland was awakened by smoke and observed flames running under the eaves and up the back of the building. His family was forced to escape in their night clothes. The Dixon family lived in the other end of the building, and they had time to clothe themselves and salvage some of their possessions.

The manager of the plaintiff's housing facilities was awakened by the hotel operator, and he dressed and went to the fire. There he met the defendant's project manager who had been aroused from his sleep by the glare in his room from the flames. The plaintiff's manager proposed that certain fire hose be obtained from Keddie Resort and coupled to hose available at the defendant's project, and that this hoseline be connected to the defendant's pipeline in an attempt to extinguish the fire. The defendant's manager stated in effect that the fire was so far advanced that the building was about to collapse and that nothing could be accomplished, and the plaintiff's manager did not pursue the matter further.

The building burned quickly. The volunteer fire department from the town of Quincy, 7 miles distant, came to the fire within a short time after the defendant's manager arrived. Its fire truck was equipped to pump water from the Spanish Creek, a substantial stream running alongside the highway.

The record in this case does not show what the firemen did or attempted to do at the fire.

Whether the defendant's water system had been extended to the plaintiff's gas-station building by pipeline or hoseline, it could not have provided water under sufficient pressure to extinguish the fire.

22. The supply of water which had been used by the plaintiff in the operation of the gas-station building came from a well or a spring and was pumped through a 1½-inch pipe by an electric motor. At the time of the fire this water was not used. The fire had destroyed the wires supplying electricity to the motor.

23. There is no reliable evidence in this record as to the fair market value of the plaintiff's gas-station building. Mr. Rihm placed a value of $32,000 on it at the time of the fire, but he was not qualified by training or experience as an appraiser.

The actual cost of construction of the building and its additions amounted to $8,910.07, not including any allowances for the labor of Mr. Rihm.

The plaintiff had insurance coverage on the property to the extent of $8,000 which sum was paid to it for the loss sustained.

Some substantial part of the plaintiff's building would have been destroyed by fire regardless of the availability of sufficient water, and there is no evidence from which it can be determined or even approximated as to what part, if any, would have remained.

24. Prior to December 3, 1948, the plaintiff had an income of approximately $200 per month from the gas-station building. This building was reconstructed in the spring of 1952.

25. Commencing sometime in 1947, Mr. Rihm repeatedly called on officials at the San Francisco regional office, and on one occasion he met with the Commissioner, Public Housing Administration, Washington, D. C., and demanded the termination and cancellation of the lease.

Mr. Rihm also complained that operation of the defendant's housing project was causing vacancies in the plaintiff's housing facilities.

26. By written agreement dated December 11, 1951, by and between the plaintiff and the defendant, acting by its Public Housing Administration, the lease was terminated effective at the close of business on December 31, 1951, and the plaintiff purchased from the defendant all structures and personal property on the premises for the sum of $12,500.

The defendant originally expended $32,986 for the installation of the sewer, water and other utilities, $988.05 as site

acquisition costs, $58,251.98 for the buildings containing the housing units, $4,057.76 for the administration building, $2,876 for furniture, $5,609.79 for plans and specifications, or a total of $104,769.58.

In December 1951 the defendant appraised the leasehold improvements, exclusive of underground pipes and utilities, at $15,000.

27. The housing units afforded by the defendant's project were two and three-bedroom apartments, which were rented respectively for $29.50 and $31.50 per month, unfurnished. Except for fuel oil, utilities were furnished.

The plaintiff's facilities consisted in part of one-bedroom cottages not comparable to the defendant's units, but there were about 25 to 28 comparable apartments and cottages which rented at $39.50 per month for two-bedroom and $45.00 per month for three-bedroom units, unfurnished. The plaintiff's tenants were required to defray the charges for utilities.

28. The renting of the defendant's project was slow at first, but full occupancy was reached about the middle of 1944. Thereafter the project remained fully occupied until the last few months of 1951, when a few vacancies occurred.

Throughout the operation of its Keddie facilities, the defendant leased its 30 units a total of 159 times, some few of which were intra-project moves. The rate of turnover did not exceed one to two families per month.

The plaintiff's facilities were completely rented until the commencement of the operation of the defendant's project. Thereafter, the plaintiff did not immediately suffer vacancies but began to experience difficulties about 6 to 8 months later.

29. Applicants for the leasing of housing units on the defendant's project were required to give their existing address. If the applicant was a resident of Keddie Resort, he was not allowed to lease a unit on the defendant's project without approval of the plaintiff's manager. Under such conditions, the defendant's project manager accepted only four tenants who had been residents of the plaintiff's housing community.

30. For the years 1948 through 1951, the plaintiff had vacancies and sustained loss of rentals in its apartments and cottages, as summarized in the following schedules:

| | Amount of vacancy | Monthly rental rate | Rental loss |
|---|---|---|---|
| Rental Unit No.: | | | |
| 3 | 6 months, 1949.. | $33.50 | $201.00 |
| 3 | 9 months, 1951.. | 33.00 | 297.00 |
| 5 | 2 months, 1951.. | 36.50 | 73.00 |
| 6 | 4 months, 1951.. | 42.50 | 170.00 |
| 8 | 1 month, 1951... | 41.00 | 41.00 |
| 9 | 3 months, 1949.. | 37.00 | 111.00 |
| 12 | 3 months, 1948.. | 14.00 | 42.00 |
| 12 | 6 months, 1949.. | 14.00 | 84.00 |
| 12 | 1 month, 1949... | 25.00 | 25.00 |
| 12 | 12 months, 1950. | 25.00 | 300.00 |
| 12 | 10 months, 1951. | 25.00 | 250.00 |
| 16 | 1+ months, 1949 | 42.50 | 59.50 |
| 17 | 5 months, 1949.. | 34.50 | 172.50 |
| 20 | 1 month, 1950... | 35.00 | 35.00 |
| 20 | 1 month, 1951... | 35.00 | 35.00 |
| 21 | 6 months, 1949.. | 30.00 | 180.00 |
| 21 | 12 months, 1950. | 30.00 | 360.00 |
| 21 | 6 months, 1951.. | 30.00 | 180.00 |
| 22 | 3+ months, 1949 | 34.50 | 122.10 |
| 22 | 7+ months, 1950 | 33.00 | 233.70 |
| 23 | 2 months, 1950.. | 33.00 | 66.00 |
| 23 | 6 months, 1951.. | 33.00 | 198.00 |
| 35 | 1 month, 1950... | 37.50 | 37.50 |
| 35 | 6 months, 1951.. | 37.50 | 225.00 |
| 46 | 4 months, 1951.. | 42.50 | 170.00 |
| 49 | 6 months, 1949.. | 30.00 | 180.00 |
| 49 | 9 months, 1950.. | 30.00 | 270.00 |
| Total loss of rentals | ................ | .......... | 4,118.30 |

The plaintiff's housing units numbered 5, 6, 8, 16, 23, 35, and 46 had two or three bedrooms each; those numbered 3, 17, 20, 21, and 22 had only one bedroom; and units 12 and 49 were described in the record respectively as a small house and 1½ bedroom unit.

In view of the nature of the community of Keddie and the limited supply of housing available, it is reasonable to conclude that very little, if any, of the plaintiff's above-scheduled loss of rentals would have occurred if the defendant's housing

project had not continued in operation after the year 1947.

After June 1945 the defendant did not limit the rental of its units to railroad workers, but accepted veterans and their families.

Prior to June 1951 the plaintiff had its hotel annex under lease to a third party at a rate of $710 per month. The lessee was in financial difficulty and this lease was terminated. In June 1951 the plaintiff leased the hotel property to a new lessee and thereafter and at all times pertinent in this case received a reduced rental of $425 per month. There is no evidence as to the extent, if any, to which the hotel business was affected by the operation of the defendant's housing project.

31. The only evidence in this record of the fee value of the plaintiff's land leased to the defendant was Mr. Bolla's appraisal at $50 per acre for 15.696 acres and $100 per acre on .066 acre, the latter being the area of the water supply, or a total of about $790 for the land leased.

There is no evidence as to the rental value of the leased premises.