PeR Curiam:
This is a Congressional reference case in which virtually all of the preparatory work had been completed by the parties prior to the decision by the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530 (1962). Therefore, we deem it proper to file this report without reference to the Supreme Court’s opinions in that case and we, therefore, forward our report to the House of Representatives in conformity with H. Res. 470, 86th Congress, 2d Session.*
The case was referred to Trial Commissioner W. Ney Evans with directions to submit his recommendation for conclusions of law with his findings of fact. He has done so in a report filed September 13, 1963, to which the parties filed their exceptions accompanied by briefs. After oral argument the matter was duly presented to the court.
The court agrees with the findings and conclusions of the trial commissioner and adopts them as its own.
The essence of the case is that the taking by the Army of a buffer zone across the Cape Fear River and extending into the Town of Kure Beach resulted in a frustration of the town’s obligation to repay bonds purchased by the Reconstruction Finance Corporation, by reason of which the court concludes that the plaintiff has an equitable claim within “the broader moral sense based upon general equitable considerations,” (Burkhardt v. United States, 113 Ct. Cl. 658, 667, 84 F. Supp. 553 (1949)); and that the fair and reasonable value of this equitable claim is $100,000.
The commissioner’s valuation of the claim was predicated on the estimate by the RFC “that the taking of the buffer zone * * * will impair the collateral value of the bonds by approximately 40%, or about $100,000.”
Upon our review of the evidence, we conclude that the RFC estimate of impairment is well supported, and that $100,000 represents the fair and reasonable value of the equi *600 table claim, based upon frustration. The figures used by the RFC in its estimates of the town’s potential revenue were predicated on a loan of $235,000, which loan, from necessity, was increased to $260,000. Prior to the taking of the buffer zone the actual net revenue of the town from the water and sewer system was almost identical to the revenue estimated by RFC. The taking of the town property by the Army reduced the revenues drastically, and the town has had to raise, by taxation, amounts considerably in excess of the sum estimated by the RFC to be required by taxation to meet the debt service. This excess amounts to approximately $3,300 per annum, and the need for it has existed and will continue to exist for many years.
The parties have stipulated that “the amounts recovered in this action by reason of such impairment will be paid by plaintiff to the Housing and Home Financing [sic] Agency to be applied to the former’s indebtedness to the latter as present holder of plaintiff’s water and sewer bonds.”
Upon the foregoing, together with the findings of fact and conclusions of law contained in the trial commissioner’s report, the court is of the opinion :
1. That plaintiff has no legal claim, for a taking under the Fifth Amendment, or otherwise;
2. That the losses incurred by plaintiff through the deprivation of (a) the value of the streets and of the utilities under those streets and (b) the revenues from ad valorem taxes and from service charges for utilities in the condemned area were consequential losses for which plaintiff has no claim, legal or equitable;
3. That the impairment of the collateral value of the bonds, resulting from defendant’s taking of the buffer zone, has created a partial frustration of plaintiff’s obligation to the Housing and Home Finance Agency (an agency of the United States), holder of the bonds;
4. That this partial frustration is cognizable as an equitable claim, within the broader moral sense of the term, based upon equitable considerations; and
5. That the fair and reasonable value of such equitable claim is $100,000.
This opinion, including the findings of fact and the opinion of the commissioner, will be certified by the Clerk to the House of Representatives pursuant to House Resolution 470, 86th Congress, 2d Session.
*601 OPINION OK COMMISSIONER
I
In this Congressional reference case[1] a small beacb resort town seeks to recover $177,206.20 as representing the loss incurred by it when defendant acquired from private owners some 40 percent of tlie land area within the corporate limits of the municipality as part of a safety buffer zone aromad an ammunition loading terminal situated across the Cape Fear Eiver from the town.
Kure Beach is located on the Atlantic Ocean some 20 miles south of Wilmington, North Carolina, in an area locally known as the peninsula, since the land area extends southward between the ocean and the Cape Fear Eiver, which is quite wide for several miles before it flows into the sea.
After a very few years of growth, the town was incorporated in 1947, with corporate limits extending from a wider strand of beach on the ocean to a narrower frontage on the Cape Fear Eiver. A map of the town appears in the findings.
As the growth of the town continued, the State Board of Health in 1950 ordered it to install a system of sanitary sewers. Compliance with the order indicated the need for the town to acquire the existing water system from its private owner, and to finance such purchase and the installation of the sewer system by means of a bond issue. State law forbade negotiation with investors for a bond issue, and the Local Government Commission considered bonds issued in compliance with the law to be unmarketable. The town therefore turned to the Eeconstruction Finance Corporation (hereinafter EFC) for assistance.
Application was made to the EFC for a loan of $185,000. The town expected to purchase the existing water system for $47,000, and to spend $138,000 on the sewer system. Extensive investigations and negotiations followed. The EFC *602 found the situation to be one in which it was authorized to act, subject to compliance bj the municipality with its standards and requirements. At the outset, the KFC found the existing water system inadequate to serve the proposed sewer system satisfactorily, and suggested improvements to the water system to cost another $50,000. Agreement was reached on a bond issue of $235,000. Bids received by the town in August 1952 indicated, to the satisfaction of both the town and the KFC, that costs had increased to such an extent that another $25,000 would be necessary to cover them. The final arrangement, therefore, was for a loan of $260,000.
Details of the transaction were agreed upon during the closing months of 1952. The bonds were issued as of November 1,1952, and were purchased by the KFC in January 1953. Contracts were let and the installation of both systems was completed by August 1953. Connections were completed 1 year later.
In October 1954, the first of a series of hurricanes struck the town, resulting in severe damage. There were three other hurricanes in 1955, and still another in 1958. Defendant argues that the hurricane damage during these 5 years (1954-1958) was enough to make future growth of the resort town a matter of speculation. The argument is unconvincing. Hurricane damage to Kure Beach was severe, although not as costly as to nearby resorts because of Kure Beach’s location on ,a coastal bluff having an elevation of 14 to 20 feet. Whether or not the favorable location was a factor in the town’s recovery, the fact is that its residents did repair and rebuild, and the resort continued to attract people. The conclusion is warranted that, had it not been for defendant’s action in relation to the safety buffer zone, the growth of the town would have continued at least to such an extent as to fulfill the expectations of the town and the KFC which were the foundation of the bond issue.
In May 1955, the owner of undeveloped property within the corporate limits of the town employed a contractor to clear additional streets shown on the plat which had just been completed. After 3 days’ work by bulldozer the work was halted upon notice from the Army that it intended to acquire *603 (by condemnation, if necessary) the area where the work was being done, as well as undeveloped land to the west of it, as part of the safety buffer zone for the ammunition loading terminal just across the Cape Fear River.
The Army’s plan to establish the Sunny Point Ammunition Loading Terminal on the west bank of the Cape Fear River was, of course, no secret. Congress had authorized the project, and had provided funds for it in November 1951. Immediately thereafter, the Army had acquired 20,200 acres for the site, all west of the river. What the residents of the area (and likewise the RFC) did not know, was the need for and the Army’s intention to create a safety buffer zone which might extend east of the river. The notice given in May 1955 was their first knowledge of it.
The Army plan called for the construction of piers on the (west) bank of the river from which vessels could be loaded. From the very inception of the plan consideration was given to the establishment of a safety buffer zone for the protection of persons (civilians) and property in the event of a mishap on one of the vessels or piers. Disagreement was evident, from the beginning, as to the extent of the buffer zone. Discussion proceeded in terms of radii of the order of 5,740 feet, 9,570 feet, or 13,400 feet.[2] Decision was not made until May 10, 1955, when the proponents of the maximum radius prevailed, and a real estate directive was issued for the acquisition of land within an arc described by a radius of 13,391 feet.
Such a radius from the west bank of the Cape Fear River extended across the river and into the corporate limits of the Town of Kure Beach more than half the distance from the river to the ocean.
Once the extent of the buffer zone was determined, the Army proceeded forthwith to acquire the land within the authorized radius. Acquisitions were made by purchase where possible and by condemnation where necessary.
*604 None of tbe land so acquired belonged to plaintiff. The acquisitions described the estates taken as—
Fee simple title thereto, subject, however, to existing easements for public roads and highways, public utilities, railroads and pipelines.
Defendant’s acquisitions nevertheless effectively deprived plaintiff (1) of the value of the streets within the condemned area and of the utilities (water and sewer lines) under those streets; (2) of the revenues theretofore available from ad valorem taxes on the properties within the condemned area and from service charges for the utilities serving the area; and (3) of the potential of growth (with its concomitant potential of further revenues from ad valorem taxes and utilities service charges) within the portion of its corporate limits acquired by defendant.
Details of these elements of loss are set forth hr the findings. Summarized, plaintiff’s potential growth was limited to 362 vacant lots, where there had been 711. Something over 1 mile of streets was rendered useless, together with such of the water and sewer lines as had been laid under them. The taking resulted in the removal from plaintiff’s tax rolls of property which had theretofore yielded $540 per annum in revenue from ad valorem taxes. It also deprived plaintiff of revenue from utilities amounting to $1,060 per annum.
Projecting the revenue losses over a period of 31 years (the time remaining for the retirement of the bonds), plaintiff asserts a compensable loss of $49,600. It places a value on the streets, water lines, and sewer lines of $23,606.20. The further claim is made for $104,000 as “severance damage,” representing an evaluation of the loss of the town’s potential for growth, and said to represent likewise the impairment of the security of the bond issue.
n
In Southern Counties Gas Company v. United States, 141 Ct. Cl. 28, 157 F. Supp. 984 (1958) cert. denied, 358 U.S. 815 (1958), plaintiff, a public utility, provided services for an area in California which was condemned by the Govern *605 ment in connection with a flood control project. Plaintiff’s property, as such, was not taken but it lost the customer accounts of 3'87 residential and 4 industrial users of its services who were moved out of the project. It also lost some of its facilities which were abandoned because they could not be removed, except at prohibitive cost. Plaintiff sued for the value of those property rights and facilities in the area which the United States did not acquire by condemnation or otherwise and for which it had not contracted to pay plaintiff,[3] and for its loss as a going concern in the taking area.
Eecovery was denied on the ground that, while plaintiff’s loss was due to the flood control project, it was, in law, a consequential and noncompensable loss. In its opinion, the court said (p. 31) :
* * * As we have seen, the properties for which compensation is sought under the Fifth Amendment were not in terms taken by the United States. They were excepted from the declarations of taking and from the condemnation complaint. Use of the properties was brought to an end by the acquisition by the United States of the land of residential and industrial customers of plaintiff, followed by demolition or removal of improvements which had been serviced by plaintiff.
We think this was not, within the compensation provisions of the Fifth Amendment, a talcing of the properties for which compensation is sought by plaintiff. Plaintiff’s loss is due to the project, but in law is a consequential and noncompensable loss. * * * Unquestionably the Whittier Narrows Dam project has also resulted in the loss by plaintiff of the use and value of some of its properties, and this may be attributed in a sense to the use made by the United States of adjoining or appurtenant land. But the connection between the use referred to and the loss to plaintiff is indirect and falls within the principle which denies compensation for loss of business.
*606 As to the franchise, it seems clear that the falling off of customers, though caused by the project, was not a taking; the franchise became less valuable due to the changed situation in the area, but we cannot construe this as a taking of the franchise. So, too, as to the rights of way and easements. Loss of their use and value is also due to the removal of plaintiff’s customers, “an unintended incident of the taking of land.” * * *
The court further said (p. 32) :
* * * Though the line between a compensable and a noncompensable loss is sometimes a thin one * * *, we think this case falls on the side of such cases as Omnia Co. v. United States, 261 U.S. 502, 510, where it is said that “for consequential loss or injury resulting from lawful governmental action, the law affords no remedy. * * *”
Omnia originated in the Court of Claims. Omnia Commercial Company, Incorporated v. United States, 56 Ct. Cl. 392 (1921). The company had a contract with a steel manufacturer for a large quantity of steel plate at a price under the market. It had acquired the contract by assignment in May 1917. In October of that year, before any deliveries had been made, the Government requisitioned the steel manufacturer’s entire production of steel plate for the year 1918, thereby preventing deliveries under Omnia’s contract. Omnia sued for just compensation as for a taking by the Government of its contract under the Fifth Amendment. The Government demurred. This court sustained the demurrer and the Supreme Court affirmed.
The Supreme Court agreed with Omnia that its contract was property within the meaning of the Fifth Amendment, but held that the result of the Government’s action in requisitioning the output of the steel mill was not a taking of the contract but a frustration of it, and that as such, the loss was noncompensable, saying: [4]
* * * In exercising the power to requisition, the Gov-ermnent dealt only with the Steel Company, which company thereupon became liable to deliver its product to the Government, by virtue of the statute and in response to the order. As a result of this lawful govern *607 mental action the performance of the contract was rendered impossible. It was not appropriated but ended.
In the instant case defendant’s brief cites Southern Counties Gas Company as conclusive that there has been no taking of plaintiff’s property, wherefore plaintiff has no legal claim for compensation under the Fifth Amendment. Supporting precedents relied on include: Kellettville Gas Co. v. United States, 56 F. Supp. 919 (W. D. Pa. 1944); United States v. Powelson, 319 U.S. 266 (1943); United States v. Grand River Dam Authority, 363 U.S. 229 (1960); Fix v. City of Tacoma, 17 P. 2d 599 (Sup. Ct. Wash. 1933); Deepe v. United States, 86 P. 2d 242 (Sup. Ct. Colo. 1939); Mullen Benevolent Corp. v. United States, 290 U.S. 89 (1933); and City of Eufaula, Alabama v. United States, 313 F. 2d 745 (5th Cir. 1963).
Plaintiff’s response to this contention is that:
* * * The cases cited * * * [by defendant] are distinguishable on their facts in that in none of them did the claimant seek to recover damages caused negligently, corruptly or in bad faith by the defendant. In the instant case, defendant’s negligence and bad faith consisted of the following:
1. Advising, urging and aiding the plaintiff to assume an indebtedness while failing to disclose that the defendant, at the same time, was contemplating a course of action which would restrict the plaintiff’s ability to pay the same.
2. Advising, urging, aiding and requiring the plaintiff to assume a larger indebtedness than it otherwise would have, while failing to disclose that the defendant at the same time was contemplating a course of action which would restrict the plaintiff’s ability to pay for the same.
3. Attempting to circumvent a physical appropriation of property utterly destroyed in value in order to avoid a duty to compensate plaintiff for the same.
Where such negligence and bad faith exist, damages, such as those in the instant case, are compensable at law. * * *
The evidence does not sustain these charges. On the contrary, it is clear from the whole record that the KFC acted in the utmost good faith. The Army, likewise, cannot validly be charged with either negligence or bad faith.
*608 The essence of plaintiff’s charge is (1) that the Army engaged in sharp practice in excluding from its acquisitions the “existing easements for public roads and highways [and] public utilities * * when it could have included them in the acquisitions and paid for them in due course; and (2) that defendant (including both the RFC and the Army) misled plaintiff to its detriment in that the RFC encouraged plaintiff to incur a debt to it (and later encouraged plaintiff to increase the amount of the debt), while the Army withheld information which, if known to plaintiff, would have influenced its judgment.
The charge of sharp practice by the Army in excluding from its acquisitions the streets and utilities is without substance. Indeed, the Army would have been remiss in its duty to the Government of which it is a part if it had failed, without substantial reason, to follow the teachings of Omnia and other precedents. The taking of plaintiff’s streets and utilities under the circumstances, when those facilities did not, in the language of Southern Counties Gas Company, supra (p. 80), “interfere with the project,” would have been unwarranted.
The charge that defendant, through one agency, permitted and even encouraged plaintiff to assume an indebtedness to it, while at the same time, through another agency, it withheld information which if known might have deterred plaintiff from incurring any such indebtedness (or, at least, as much as it did incur), requires further examination.
It must be noted at the outset that plaintiff’s brief exaggerates somewhat the role of the RFC in permitting plaintiff to incur the indebtedness of the bond issue and in encouraging plaintiff to increase the amount initially contemplated. Plaintiff turned to the RFC at a time when it was under a mandate from the State Board of Plealth requiring it, in effect, to abate a nuisance. The RFC responded in a cooperative spirit. The standards it imposed were only the minimum of sound engineering and investment. These standards required an increase of plaintiff’s original estimate from $185,-000 to $235,000, to enable the water system to serve the sewer system satisfactorily. The further increase of $25,000, raising the total of the bond issue to $260,000, was in no way at *609 tributable to the NFC. It was the result of increases in cost which developed during the time lag incurred by plaintiff in conforming to the legal requirements of the State of North Carolina.
With respect to plaintiff’s charge that it was misled, in that the NFC followed one course while the Army followed another, with neither ostensibly knoAving what the other was doing, plaintiff relies on the conception of defendant, as the Government of the United States, being a single entity. There is some support for this view.
In the case of Bank Line v. United States, 163 F. 2d 133 (2d Cir. 1947); also 76 F. Supp. 801 (S.D.N.Y. 1948), Bank Line had filed two libels against the United States to recover damages to one of its vessels arising out of a collision which occurred in the channel leading into Casablanca in 1944. Several vessels, traveling in convoy in thick weather, were involved in the mishap. Contending that the truth about the collision would have to be ascertained by combining the observations of the different vessels, the libellant sought disclosure of the facts developed at an investigation by a Naval Board, convened pursuant to Navy Negulations. The libel-lant moved in the District Court for an order directing the United States to produce, among other items, a transcript of the hearing before the Naval Board.
The Navy objected to the granting of the motion, and eventually asserted privilege. The District Court granted the motion nevertheless. After the Court of Appeals declined to issue an extraordinary writ of prohibition or mandamus to prevent enforcement of the order, the District Court reneAved the order to produce. In its opinion, the court made the following observations:
* * * The argument advanced by the government that the privilege is that of the Navy Department whereas suit is prosecuted by the Department of Justice for the benefit of the Treasury Department, and that the Navy Department, not exercising any discretion as to institution of litigation, cannot be deemed to have waived its privilege, has already been froAvned upon in United States v. Grayson, supra. The several departments are all agencies of one government, possessed, theoretically, at least, of a single will. * * * [Emphasis supplied.]
*610 In its relation to the legal aspects of the instant case, however, the Bank Line concept of “* * * one government, possessed * * * of a single will * * is outweighed by the reasoning of Bateson-Stolte, Inc. v. United States, 158 Ct. Cl. 455, 305 F. 2d 386 (1962); see also 145 Ct. Cl. 387, 172 F. 2d 454 (1959).
The plaintiff in Bateson-Stolte had entered into a contract with the Army’s Corps of Engineers for the construction of a powerhouse at Clark Hill, near the South Carolina-Georgia border. Plaintiff had based its bid on the wage rates found by the Secretary of Labor under the Davis-Bacon Act to be prevailing. A few months later the Atomic Energy Commission selected a site nearby for the construction of new production facilities at a cost of $1 billion. A new wage determination set wages prevailing in the region at rates higher than had been determined, for plaintiff’s project, and the AEC contractor raised them even higher. Plaintiff and its subcontractor had to increase their wage rates to hold their work forces. Plaintiff sued to recover the excess costs.
When the case was first before the court on defendant’s motion to dismiss, the court expressed the opinion that if the Corps of Engineers (which had made site investigations for the AEC) knew the AEC project was to be located in the vicinity of the Clark Plill powerhouse and that a large labor force would be necessary for its construction, to secure which wages considerably higher than the prevailing wage rate would have to be paid, the Corps of Engineers was under the duty to disclose it. In the decision of July 18, 1962, the court said:
* * * Although the United States was the contractor both for the Clark Hill Project and for the AEC project, we nevertheless held that, in view of the vastness of the business engaged in by the United States Government, with its multitudinous departments and bureaus and independent agencies scattered all over the world, the knowledge of the AEC could not be imputed to the Corps of Engineers. * * *
The court remanded the case to the trial commissioner to determine the extent of the knowledge of the Corps of Engineers concerning the projected AEC undertaking at the time of its award of the contract for the Clark Hill project. *611 The commissioner found (and the court adopted his findings) that, while the Corps of Engineers made extensive site investigations for the AEC, among which was a site near the Clark Hill project, it was not advised of the immensity of the AEC project nor of the large labor force that would be required. There was a further finding that, when the Clark Hill contract was made, the Corps of Engineers did not know, nor could it have known through the exercise of reasonable diligence, that the new production plant of the AEC would be located within the geographical area of the Clark Hill project.
In denying plaintiff the recovery it sought, the court said:
* * * we do not think the Corps of Engineers was in possession of any information which it was under the duty to disclose to plaintiff prior to the execution of the contract.
sf: ^ ;f:
We conclude that when the Corps of Engineers entered into its contract with plaintiff, it neither expressly nor impliedly agreed that the AEC would not enter into its contracts in the vicinity. We think this would have been true of any contract entered into by another agency of the Government. It is especially true where the subsequent contract was entered into in order to promote the national defense. This was a sovereign act for which the Government is not liable in damages. * * *
The reasoning of Bateson-Stolte absolves the RFC of any failure in its responsibilities to the Town of Kure Beach. The RFC did not know of the Army’s plans for a buffer zone around the Sunny Point Terminal. The knowledge of the Army could not be imputed to the RFC. And the RFC cannot be said to have agreed, expressly or impliedly, when it bought plaintiff’s bonds, that the Army would not establish such a buffer zone.
The Army, once its decision had been made as to the extent of the safety buffer zone, informed the plaintiff immediately that the buffer zone would encroach upon the municipality’s corporate limits. Plaintiff’s contention is that the Army knew all along that such a result might occur, and that it should have advised plaintiff of the possibility. In view *612 of tbe Army’s ultimate decision, such information probably would have been helpful. But suppose the Army had told plaintiff that among the buffer zone limits under consideration was one which would reach into the town; and suppose further that the town had restricted or withheld its commitments accordingly. If the Army had then finally decided on a buffer zone which extended only to the east bank of the Cape Fear Biver, the resentment of Army meddling by the residents and officials of the town might have been even more pronounced.
In any event, the Sunny Point Terminal was a national defense project, as to which the Army cannot be said to have had a duty to disclose its plans.
My conclusion is that the decision in Southern Counties Gas Company, supra, is controlling of the legal aspects of plaintiff’s claim, and that plaintiff has no legal right to recover as for a taking under the Fifth Amendment.
m
As the basis for recognition of an equitable claim against the United States, plaintiff relies on Burkhardt et al. v. United States, 113 Ct. Cl. 658 (1949) 84 F. Supp. 553.
Defendant challenges the validity of an equitable claim under the Burhhardt decision on three grounds: (1) that the relationship of the RFC to the defendant (as one of its corporate bodies) is irrelevant; (2) that the United States as a contractor cannot be held liable directly or indirectly for the public actions of the United States as a sovereign, citing Wah Chang Corporation v. United States, 151 Ct. Cl. 41 (1960), 282 F. 2d 728; Jones v. United States, 1 Ct. Cl. 383 (1865); and Horowitz v. United States, 267 U.S. 458 (1925); and (3) that consequential losses, not compensable as legal claims, are likewise not compensable as equitable claims unless they are rested on some unjustified act or omission which caused the damage, citing B Amusement Company et al. v. United States, 148 Ct. Cl. 337 (1960), 180 F. Supp. 386; and Keddie Resort, Inc. v. United States, 130 Ct. Cl. 259 (1954), 125 F. Supp. 943.
I cannot agree that the relationship of the RFC to the United States is irrelevant, for reasons hereinafter noted.
*613 As to the effect of sovereignty in saving the United States from liability, directly or indirectly, and of fault on the part of the Government as a predicate for an equitable claim, a brief review of Burhhardt is necessary to place these points in perspective.
Bertha Burhhardt and others were successors in interest to the Willow Biver Power Company which had owned a hydroelectric plant near the confluence of the Willow and St. Croix Bivers in Wisconsin. A dam erected by the United States had raised the level of the St. Croix, a navigable river, and had thereby interfered with the operation of the power company’s tailrace. The company sued for just compensation as for a taking under the Fifth Amendment. This court found for the plaintiff (101 Ct. Cl. 222). The Supreme Court reversed (324 U.S. 499) on the ground that whatever right or interest the power company may have had, it was subordinate to the Government’s dominant servitude in the interests of navigation, wherefore there was no taking by the United States. The successors in interest of the power company came into the Court of Claims by way of a congressional reference, seeking compensation for an equitable claim based upon substantially the same allegations as had been put forward by the power company.
This court overruled defendant’s motion to dismiss, based on res judieata, and heard the case on the merits. The Government contended that Congress had used the term “legal or equitable” claim in section 2509 of the Judicial Code in its strict legal sense and not in a broad general sense meaning “moral claim.” The court ruled otherwise, holding that plaintiffs did have an “equitable” claim against the Government in a broad nonjuriclical sense. The term “equitable” claim in section 2509, the court said, was “not used in a strict technical sense meaning a claim involving consideration of principles of right and justice as administered by courts of equity, but the broader moral sense based upon general equitable considerations.” The court further said:
P H P pj ® ' 2. CD CO .£*§ O ® &' §2 in ¡AP ® s ;8 So? mP ti g 3* ‘S'gg a o & -§ n <*-013 v_, - CD I-* os-? Í — ■ g ® *614 they been so deprived of their property by private individuals not holding a dominant easement * * *, they would have been entitled to compensatory damages for such taking in a court of law. * * *
Defendant’s assertion that “the United States as a contractor cannot be held liable directly or indirectly for public acts of the United States as a sovereign” is a quotation from the opinion of this court in Jones v. United States, supra. In that case, two civil engineers had a contract with the Commissioner of Indian Affairs to survey certain “districts” described in an Indian treaty. The United States subsequently withdrew the troops that had been stationed in the Indian country to preserve order, and the surveyors were delayed and hindered in their work. They sued for “just compensation for all additional expenses thereby incurred.”
In its consideration of the case, the court emphasized the distinction between the “two characters which the government possesses as a contractor and as a sovereign * * Following is the pertinent excerpt from the opinion:
* * * In the recent case of Doming against the United States this court decided that a contract between the government and an individual cannot be affected specially by a general law. That principle we now reiterate and extend to the case before us. The “obstructions and hindrances” complained of on the part of the United States were the withdrawal of their troops from the military posts in the Indian country, contrary to the terms of the Indian treaties; and it is insisted, “as a matter of law,” that “the United States could not change their attitude or their folioy in a material degree, without incurring the responsibility of making the claimants just compensation for all additional expenses thereby incurred.”
This position cannot be sustained. The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with pri *615 vate persons. The laws of taxes and imposts _ affect pre-existent executory contracts between individuals, and affect those made with the government, but only to the same extent and in the same way. In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants. Wherever the public and private acts of the government seem to commingle, a citizen or corporate body must by supposition be substituted in its place, and then the question be determined whether the action will lie against the supposed defendant. If the enactment of a law imposing duties will enable the claimant to increase the stipulated price of the goods he has sold to a citizen, then it will when the United States are defendants, but not otherwise. If the removal of troops from a district liable to invasion will give the claimant damages for unforeseen expenses, when the other party is a corporate body, then it will when the United States form the other party, but not otherwise. This distinction between the public acts and private contracts of the government — -not always strictly insisted on in the earlier days of this court — frequently misapprehended in public bodies, and constantly lost sight of by suitors who come before us, we now desire to make so broad and distinct that hereafter the two cannot be confounded; and we repeat, as a principle applicable to all cases, that the United States as a contractor cannot be held liable directly or indirectly for the public acts of the United States as a sovereign.
In Deming's Case, 1 Ct. Cl. 190 (1865), cited in Jones, supra, the claimant had contracted with the quartermaster to furnish rations to the Marine Corps, during the year 1861 in one contract, and for the year 1862 in another contract. He lost money on the first contract because in August 1861 Congress imposed an additional duty on articles constituting part of the rations, and prices went up. He lost money on the second contract because of the Legal-Tender Act of February 1862. He sued to recover his losses, claiming that the United States, by these legislative enactments, changed his contracts *616 by imposing new conditions "upon them. In denying recovery, the court said:
* * * A contract between the government and a private party cannot be specially affected by the enactment of a general law. The statute bears upon it as it bears upon all similar contracts between citizens, and affects it in no other way. In form, the claimant brings this action against the United States for imposing new conditions upon his contract; in fact he brings it for exercising their sovereign right of enacting laws. But the government entering into a contract, stands not in the attitude of the government exercising its sovereign power of providing laws for the welfare of the State. The United States as a contractor are not responsible for the United States as a lawgiver. Were this action brought against a private citizen, against a body corporate, against a foreign government, it could not possibly be sustained. In this court the United States can be held to no greater liability than other contractors in other courts.
Deming',s Case, supra, was cited by this court as controlling the case of Horowitz v. United States, 58 Ct. Cl. 189 (1923), where plaintiff entered into a contract with the United States to purchase silk, under an arrangement whereby he might resell the silk before completing payment of the purchase price. He arranged the resale, paid the balance of the purchase price, and directed delivery of the silk accordingly. Meanwhile, the Bailroad Administration placed an embargo on shipments of silk by freight. By the time arrangements were made for shipment by express, the price of silk had declined, the purchaser from plaintiff refused to accept delivery because of the delay, and plaintiff eventually had to sell the silk at a price considerably below the price his original consignee had agreed to pay. Plaintiff sued for this loss, and the court sustained the Government’s demurrer to his petition. Plaintiff appealed the decision to the Supreme Court.
The Supreme Court affirmed, saying:
’ It has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign. Deming v. United States, 1 Ct. *617 Cls. 190, 191; Jones v. United States, 1 Ct. Cls. 383, 384; Wilson v. United States, 11 Ct. Cls. 513, 520. In the Jones Case, supra, the court said: “The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons. * * * In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants.”
Wilson’s Case, cited by the Supreme Court in Horowitz, supra, reflects another application by Nott, J., of the principles enunciated by him in J ones, supra, and Deming, supra. Wilson had contracted with the Quartermaster General to deliver a certain number of mules in Washington. He brought the mules from Kentucky to the outskirts of Washington, arriving at a moment when the capture of the city by Confederate forces seemed imminent. The military governor refused to let him proceed. In the course of the delay, some of the mules were captured. The Quartermaster General nevertheless demanded and eventually got the full number contracted for. The court found as a fact that Wilson did all that he could be reasonably expected to do under the circumstances, and that he would have performed all that his agreement required if he had not been directly prevented by the military forces of the United States. The court nevertheless denied him recovery (for the value of the mules captured), saying:
* * * The first case in this court where the public acts of the Government were set up as a breach of a contract was that of Deming * * *. The alleged interference was by the legislative branch of the Government. * * * The question in another form was again presented in the case of J ones * * *. There the acts complained of were by the executive branch of the Government * * *. *618 The court extended the rule in Deming's Case to executive as well as legislative acts, and held, that it is a ’principle, applicable to all cases, that the United States as a contractor cannot be held liable for the public acts of the United States as a sovereign, and that whatever acts the Government may do, be they legislative or executive, so long as they are public and general, cannot be deemed specially to alter, modify, obstruct, or violate the particular contracts into which it enters with individuals.
The principles enunciated in the foregoing precedents were approved and applied in the more recent case of Wah Chang Corporation v. United States, supra. That case came before the court under the authority of a private law, wherein Congress authorized the court to hear and determine the claim “notwithstanding any statute of limitations, lapse of time, or any prior court decision on this claim * * and with a further provision that “nothing contained in this Act shall be construed as an inference of liability on the part of the United States * * The court noted the latter provision specifically and said that it, “coupled with the legislative history, indicates clearly that the Congress did not intend to waive any defenses the Government might have * * * other than ‘any statute of limitations, lapse of time, or any prior court decision.’ ” Recovery was denied on the ground that plaintiff had no legal right to recover. No considerations of an equitable nature were raised or discussed.
Wah Chang held a lease on part of a New York pier, on which it established a plant for processing and refining tungsten ore. In 1941, the Metals Reserve Company (a subsidiary of the RFC) entered into a contract with Wah Chang for the processing of tungsten ore, on the basis of which Wah Chang enlarged its plant. In February 1942, the Secretary of War took over the pier by condemnation and required plaintiff to vacate. Plaintiff did so, under an arrangement with Metals Reserve for the use of another plant where its operations were continued. The suit was filed to recover (1) the loss represented by the unamortized portion of the fixtures and equipment that could not be moved from the pier and (2) the transportation, labor, and overhead costs in *619 curred in moving those fixtures and equipment that were movable.
With respect to the effect of the taking on plaintiff’s contract, the court remarked in passing that—
* * * Presumably, the plaintiff would have been justified in ceasing its tungsten operations under its contract with Metals Reserve when the condemnation proceedings were initiated * * *. * * *
The portions of the Wall Ghcmg opinion which are relevant to the contractor-or-sovereign status of the United States are quoted below (in pertinent part) :
This court has held that it. is “an implied provision of every contract, whether it be one between individuals or between an individual and the Government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance.” George A. Fuller Co. v. United States, 108 Ct. Cl. 70, 94 (1947). See also United States v. Peck, 102 U.S. 64 (1880); 5 Williston, Contracts § 1298A (Rev. Ed. 1937); Restatement, Contracts § 315. Unquestionably, from the standpoint of cause and effect the War Department’s condemnation of the pier rendered more costly plaintiff’s performance of the tungsten contract with Metals Reserve.
Within the rule that prevention of performance by the other party constitutes a breach of contract there has been carved out the exception or qualification “that the United States as a eontraetor cannot be held liable directly or indirectly for the public acts of the United States as a sovereign.” Jones v. United States, 1 Ct. Cl. 383,385 (1865). [Emphasis supplied.] * * * This doctrine received the approval of the Supreme Court in Horowitz v. United States, 267 U.S. 458 (1925).
As a practical test for determining the Government’s liability “whenever the public and private acts of the government seems to commingle,” this court has stated that
a citizen or corporate body must by supposition be substituted in * * * [the Government’s] place, and then the question be determined whether the action will lie against the supposed defendant. [For example], if the enactment of a law imposing duties will enable the claimant to increase the stipulated price of goods he has sold to a citizen, then it will when the United *620 States are defendants, but not otherwise. [See Deming v. United States, 1 Ct. Cl. 190 (1865).] If the removal of troops from a district liable to invaision will give the claimant damages for unforeseeta. expenses, when the other party is a corporate body, then it will when the Unitd States form the other party, but not otherwise. This distinction between the public acts and private contracts of the government * * * we now desire to make so broad and distinct that hereafter the two cannot be confounded; and we repeat, as a principle applicable to all cases, that the United States as a contractor cannot be held liable directly or indirectly for public acts of the United States as a sovereign.
We do not believe it is unfair to deny the plaintiff any advantage from having the Government as its defendant, since it merely places the plaintiff on an equal footing with others whose non-Government contracts might also have been frustrated by the condemnation. * * *
The precedents from Deming’s Case to Wah Ohcmg make it abundantly clear that the United States as a contractor cannot be held legally liable for the public acts of the United States as a sovereign. In the instant case, there can be no question but what the United States assumed the character of a contractor when the RFC made a loan to the Town of Kure Beach or that the United States acted in its sovereign capacity when the Army took the land comprising the safety buffer zone. In that portion of this opinion dealing with plaintiff’s claim of legal liability, the conclusion was wholly consonant with the precedents. Plaintiff has no legal claim.
Defendant would extend this exemption from legal liability so as to preclude recognition of an equitable claim as well, although equitable considerations are nowhere mentioned in the cases cited. The single peg on which to hang the argument is a sentence in the Jones opinion wherein the court said that “the United States as a contractor cannot be held liable directly or indirectly for the public acts of the United States as a sovereign.” [Emphasis supplied.]
The terms “directly” and “indirectly” were not there used in the sense of “legal” or “equitable,” as is evident from statutory evolution. Reference of claims to this court by either House of Congress was first authorized in 1888 (18 *621 years after tbe decision in Jones), by an act “to afford assistance and relief to Congress and the executive departments in the investigation of claims and demands against the government,” approved March 3,1883,22 Stat. 485. The term “legal or equitable” claim made its appearance in section 14 of the Tucker Act, approved March 3, 1887, 24 Stat. 505, 507-08. It was carried forward in the Judicial Codes of 1911,1940,and 1948.
The power of eminent domain is a sovereign function.[5] “The right is the offspring of political necessity; and it is inseparable from sovereignty * * Kohl el al. v. United States, 91 U.S. 367, 371 (1875). By the same token, the “dominant servitude” of the United States over navigable waters, which precluded recovery by the Willow River Power Company, was a sovereign attribute. When this court found Burkhardt and others, as successors in interest to the Willow River Power Company, to be possessed of an equitable claim against the Government, it reached the conclusion under circumstances wherein the claimants’ deprivation of a legal right was the result of the exercise of sovereign power.
The conclusion follows, therefore, that the exercise by the United States of a sovereign function in taking the land required for the safety buffer zone does not preclude the satisfaction by Congress[6] of an equitable claim of the plaintiff, if it has such a claim.
Defendant’s final point, that some fault or omission on the part of the United States must supply the foundation for an equitable claim, rests on the following excerpt from the opinion of the court in B Amusement Company et al. v. United States, 148 Ct. Cl. 337, 342 (1960) :
We come, then, to the final question before the court, which is whether the plaintiffs have an equitable claim against the United States. The word “equity” in this context is used in the sense of broad moral responsibility, what the Government ought to do as a matter of good conscience. Georgia Kaolin Co. v. United States, 145 *622 C. Cls. 39, Gay Street Corp. v. United States, 130 C. Cls. 341. Under even this theory, however, defendant's liability must rest on some u/njustified act or omission to act which caused plaintiffs’ damage; otherwise any award would be a pure gratuity. [Emphasis supplied.]
In the Georgia Kaolim, Company matter, a congressional reference case, the United States had leased lands for use as a military installation with an agreement to restore the lands to their original condition upon termination of the lease. The lands were returned with a number of unexploded shells left embedded within the top 6 feet of part of the land. Plaintiff was therefore unable to carry on its mining operations without incurring considerable additional expense. The court i*eported an equitable claim for such additional expense.
In Gay Street Corporation, another congressional reference case, the United States negotiated a lease of plaintiff’s premises for 21 months and an agreement that plaintiff would make alterations and improvements satisfactory to the Government. Plaintiff made the alterations and improvements. The Government then terminated the lease and vacated the building after 9 months of occupancy. The court recommended that plaintiff be reimbursed proportionately for repairs made to the property for the convenience of the Government.
In each of these cases, it is apparent that there was “some unjustified act or omission to act which caused plaintiffs’ damage.”[7]
In the B Arrmsement Company case, the plaintiff sought to recover losses and damages resulting from a flood on the Missouri Biver. They alleged that their losses resulted from the negligent placing of dikes and revetments by the Army Corps of Engineers, which caused an ice gorge, the melting of which caused the flood. The court concluded that, “on the basis of all the facts, * * * the United States is not equitably responsible for the plaintiffs’ damages, since it is in no way at fault.”
When read in proper context, these three cases (Georgia Kaolin Company, Gay Street Corporation, and B Amusement Company) mean only that when a claimant seeks to *623 establish an equitable claim on the basis of “some unjustified act or omission to act” as the cause of damage, he must prove his case, both the fault and the causation. The excerpt from the opinion in B Arrvusement Company on which defendant relies cannot validly be read to impose a limitation on all “equitable claim” cases in the category of Burkhardt. There was no “fault” in Burkhardt, which is the bellwether of the doctrine. If the court had intended such a limitation on the doctrine as a whole, it would have said so in unmistakable terms.
Plaintiff’s assertion of an equitable claim under Bxvrkhardt is therefore for consideration of the merits.
Referring once more to the line of cases hereinabove reviewed (beginning with Doming and ending with Wah Chang), there is discernible one common theme.
From Doming: “Were this action brought against a private citizen * * *, it could not possibly be sustained.”
From Jones: “Wherever the public and private acts of the government seem to commingle, a citizen or corporate body must by supposition be substituted in its place, and then the question be determined whether the action will lie against the supposed defendant.”
From Horowitz (quoting from Jones) : “In this court the United States * * * are to be held liable only within the same limits that any other defendant would be in any other court.”
From Wah Chang (after quoting the above excerpt from Jones) : “We do not believe it is unfair to deny the plaintiff any advantage from having the Government as its defendant, since it merely places the plaintiff on an equal footing with others whose non-Govemment contracts might also have been frustrated by the condemnation.”
In the instant case, “the public and private acts of the government seem to commingle.” Therefore, by supposition, let there be substituted in the place of the Government as defendant a private citizen or body corporate, and determine what action, if any, would lie against the supposed defendant.
In Burkhardt, the court said “* * * had [plaintiffs] been so deprived of their property by private individuals not hold *624 ing a dominant easement * * *, they would have been entitled to compensatory damages for such taking in a court of ■law.” ■
By way of eliminating the Government from the instant transaction, let it be supposed (1) that plaintiff had sold its bonds to private investors on the public market, instead of to the RFC; and (2) that other private individuals or a corporation (instead of the Army) had bought from the pri- . vate owners the lots and undeveloped land, leaving the easements for streets and utilities untouched, and then had withheld any use of the property so acquired in a way that would assist the town’s growth. As owners of land within the corporate limits of the municipality, they would have been subject to taxes imposed by the town on vacant lots or unimproved land. But would an action lie against them, on behalf of either the town or the bondholders, for impeding the growth of the town, or for a “taking” of the streets and utilities? Probably not. Cf. Mullen Benevolent Corp. v. United States, 290 U.S. 89 (1933).
Carrying the hypothesis a step further, however, let it be supposed that the individuals or the corporation which purchased the vacant lots and undeveloped land, and then withheld them from further development, were likewise the owners of plaintiff’s bonds. Under these circumstances, the owners of the lots and land still might not be amenable, as such, to a suit by the town, but if they, as owners of the bonds, should find it necessary to sue the town on the obligation evidenced by the bonds, the town could plead frustration as an excuse for nonpayment.
A similar hypothesis can be applied to the facts of Omnia Commercial Oompany v. United States, supra, which was the foundation of Southern Counties Gas Company v. United States, supra. In Omnia, the plaintiff had a contract with a steel company for steel plate to be manufactured by it. .Before any deliveries were made, the Government requisitioned all of the steel company’s production. The court held that the contract was not taken, but frustrated; “it was not appropriated but ended.”
Now, to vary the facts slightly, let it be supposed that Omnia had the contract for steel plate to be produced by the *625 steel company; that it entered into a contract with the Navy to sell to it the steel plate to be so produced; that before any deliveries were made, the Army requisitioned the steel company; and that the Navy sued Omnia for breach of contract in failing to deliver. The frustration of Omnia’s contract with the steel company by the Army requisition would have excused Omnia, in law, for its failure to deliver the steel plate to the Navy.
As this court said in Wah 0Jiang: “Presumably, the plaintiff would have been justified in ceasing its tungsten operations under its contract with Metals Reserve when the condemnation proceedings were initiated * *
According to the Restatement: “Where the existence of a specific thing * * * is, * * * in. the contemplation of both parties, necessary for the performance of a promise in the bargain, a duty to perform the promise * * * is discharged if the thing * * * subsequently is not in existence in time for seasonable performance * * *. * * * Material deterioration of such a specific thing * * * has the same effect as non-existence in * * * discharging [a promisor’s duty], except that if the other party remains ready and willing to render in full the agreed exchange for whatever performance remains possible, the promisor is under a duty to render such partial performance unless the deterioration * * * would make performance by him materially more burdensome.” Restatement of the Law, Contracts, Yol. II, 1932, § 460.
The rule applies “When the existence of particular facts other than specific things * * * is, * * * in the contemplation of both parties, necessary for the performance * * Ibid. § 461. The same principle applies to partial impossibility. § 463.
As noted in finding 20, the RFC, in March 1956, advised the Army’s Chief of Engineers:
At the time this loan was authorized, there was no indication that any of the territory within the corporate limits of Kure Beach would be required for defense activity and our evaluation of the soundness of the water and sewer obligations purchased by R.F.C. was based on the town’s ability to pay, plus unrestricted possibilities for growth and development of the entire area. * * *
*626 We believe it is apparent that the acquisition of this safety zone will restrict the town’s growth, will materially reduce the collateral supporting the Kure Beach bonds * * * and will seriously impair the ability of the town to meet its obligations. * * * it is our present estimate that the taking of the buffer zone as presently delineated will impair the collateral value of the bonds by approximately 40%, or about $100,000. * * *
The buffer zone was taken by the Army as then delineated, and the evidence warrants the conclusion that the “collateral value” of the bonds was thereby impaired to the extent of $100,000.
This impairment is, in my opinion, cognizable as an equitable claim, within “the broader moral sense based upon general equitable considerations.” Such impairment represents a partial frustration by the United States acting as the sovereign of plaintiff’s obligation to the United States as a contractor. When the public and private acts of the Government are thus commingled, “the broader moral sense based upon general equitable considerations” warrants substantive recognition of the rights plaintiff would have as against a citizen or body corporate for such a frustration under similar circumstances.
The parties have stipulated that “the amounts recovered in this action by reason of such impairment will be paid by plaintiff to the Housing and Home Financing [sic] Agency to be applied to the former’s indebtedness to the latter as present holder of plaintiff’s water and sewer bonds.”
FINDINGS or Fact
i
1. (a) Following is the text of H. Bes. 470, 86th Congress, 2d Session:[1]
Resolved, That *he bill (H.R. 10919) entitled “A bill for the relief of the town of Kure Beach, North Carolina,” together with all accompanying papers, is hereby referred to the Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and the court *627 shall proceed expeditiously with the same and report to the House, at the earliest practicable date, such findings of fact, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy, and conclusions based on such facts as shall be sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and.the amount, if any, legally or equitably due from the United States to the claimant.
(b) Following is the text of H.B. 10919, 86th Congress, 2d Session:[2]
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, the sum of $139,300 to. the town of Kure Beach, North Carolina, in full settlement of its claims against the United States based upon the Army’s inclusion of a substantial part of the land area of the town within the safety buffer zone in connection with the. Sunny Point Army Terminal, and the taking of public and.private property within said safety zone, and including its claims for loss of and damage to street, water, and sewer improvements in the area, cost of acquiring substitute sites for sewer disposal and garbage land-fill facilities, loss by reason of reduction of taxable assets, loss, of anticipated revenues, impairment of the town’s ability to repay bonded indebtedness incurred to construct its water and sewer system and decrease in the value of said system, and its claims based upon the resultant restrictions on the ability of the town to develop and grow and meet its obligations: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in collection with the claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
*628 (c) On April 20, 1960, the Clerk of the House of Representatives transmitted to this court H. Res. 470, accompanied by H.R. 10919. and H. Rept. 1410. Thereafter, on April 27, 1960, the clerk of this court, pursuant to Rule 14, served upon plaintiff and defendant notice of the filing of H. Res. 470 and accompanying papers.
(d) Plaintiff’s petition was filed on July 25, 1960. Defendant answered on October 11, I960.[3]
n
2. (a) Plaintiff, a beach resort town with a permanent population,[4] is an incorporated municipality[5] located in the southern part of New Hanover County, North Carolina, between the Atlantic Ocean on the east and the Cape Fear River on the west.
(b) Plaintiff’s corporate limits, as established by the statute incorporating the municipality, are shown on a map which was appended to the petition and which is reproduced and incorporated herein as Exhibit A. (See p. 31.) The heavy line on the map delineates the area acquired by the Army as a safety buffer zone for the Sunny Point Army Terminal, located on the west bank of the Cape Fear River.
(c) Under the laws of North Carolina,[6] plaintiff is authorized to provide, has heretofore provided, and is now providing to persons residing within its corporate limits, usual municipal services, including police and fire protection, street construction and maintenance, trash and garbage collection, and water and sewer services.
3. (a) On August 3,1950, the North Carolina State Board of Health ordered plaintiff to proceed forthwith to con *629 struct and put into operation an adequate system of sanitary sewers.[7]
(b) As plaintiff undertook to comply with the order, it became apparent that the objective could not be fully realized unless the municipality acquired the existing waterworks system, which was then privately owned by L. C. Kure.[8] Plans were therefore made to acquire the water system and to construct a sanitary sewer system.
(c) North Carolina law required that municipal bonds be advertised for public sale by the Local Government Commission. Plaintiff was therefore unable to negotiate with investment dealers for the purchase of its obligations as a means of financing the improvements.:
(d) The secretary of the Local Government Commission advised the Beconstruction Finance Corporation (hereinafter BFC) that in his opinion plaintiff’s obligations would' not be marketable to the general public.
(e) The limited ability of plaintiff to finance the acquisition of the water system and the construction of the sanitary sewer system was known to the BFC. It was a prerequisite for the BFC to purchase the bonds.
4. (a) Plaintiff initially contemplated the issuance of bonds in the amount of $185,000, to be applied: (1) $47,000

*630

to the acquisition of the existing water system; and (2) $138,000 to the construction of the sanitary sewer system.
(b) On November 9, 1950, plaintiff filed with the EFC an application for a loan in the total amount of $185,000.
(c) Thereafter (also in November 1950) a representative of the RFC expressed the opinion that the water system to be purchased from Mr. Kure was not adequate to support the contemplated sewer system satisfactorily over a long period, and that the water system should be improved by the installation of larger sized mains and the erection of *631 an elevated steel tank. The North Carolina State Board of Health subsequently concurred, as did plaintiff’s consulting engineer.
5. (a) The State Board of Health had found plaintiff’s area to be popular and growing rapidly, considered its outlook for continued growth to be good, and so advised the RFC.
(b) In January 1951, representatives of the RFC made a field investigation of the water system to be acquired by plaintiff and reported to the Public Agency Branch of RFC as follows:
* * * Our field investigation on January 2 and 3 confirmed our earlier conclusion that the proposed project would not be economically and engineeringly sound unless it was revised to provide for certain improvements to the existing water system. As a result of our conferences with the Town officials and the Consulting Engineer, the applicant has revised the project to include such improvements and now requests a loan in the total amount of $235,000, as is evidenced by the attached copy of a letter from the Mayor.
(c) By letter dated February 16, 1951, plaintiff’s mayor advised the Chief, Public Agency Branch, RFC:
* * * On Jany. 3, 1951 Mr. A. K. Maddox and Mr. B. P. Rice of the Atlanta, Ga., Office was here and went over the Property in General but recommended a change and a enlargement in the Water System which would require and [sic] additional $50,000 or a total of $235,000 asked for, which I believe they recommended to your office. * * *
(d) Plaintiff’s consulting engineer concurred in these findings and recommended an increase of $50,000 in the amount of the loan applied for, to cover the cost of the suggested improvements in the water system.
(e) As a result of conferences between representatives of the RFC and plaintiff’s officials (including its consulting engineer), and by reason of the recommendations made by the representatives of RFC, plaintiff revised its plans to include the suggested improvement of the water system and applied to RFC for a loan in the amount of $235,000.
*632 • (f) The proceeds to be derived from the loan, were to be used (1) to acquire the existing waterworks system for the approximate amount of $44,587.03; (2) to construct improvements-thereto at an estimated cost not to exceed $55,-412.97; and (3) to construct a public sewer system at an estimated cost of $135,000.
6. On January 19, 1951, officials of the Public Agency Branch, Office of Loans, of the RFC, submitted an Engineering & Finance Report on plaintiff’s application for the loan of $235,000, wherein- they recommended favorable action on the application “* * * subject to standard RFC conditions as to submission * * * and approval * * * of the final plans, specifications * * *” et cetera. Following are pertinent excerpts from the report:
íJí # ijs
* * * The outlook is favorable for a continuation of the past rate of growth of the area, which will be enhanced by the construction of the proposed project. * * *
* ‘ * * % #
* * * Although Kure Beach experiences a substantial amount of summer beach resort business, it is primarily a year-round residential community. * * * The year-round population is estimated locally at approximately 1000 with a maximum of 5000 during the summer months.
V »!• H»
* * * Its fiscal operations have, however, been satisfactory and approximately $10,000 has been invested in improvements in the Town. Receipts from all sources for the fiscal year ended June 30, 1950, were $10,244.78, and disbursements amounted to $7,520.18. The municipal tax rate for the period was $1.50 per hundred dollars of valuation, and the tax collection record has been reasonably good.- The assessed valuation of all taxable property for 1950 was $493,355.00 and it is anticipated that the valuation for 1951 will approximate $600,000. The assessed valuation is allegedly 37% of the actual value, which would indicate a total actual value for 1950 of $1,333,333, which in our opinion is a conservative figure. * * *
*633 The existing waterworks system has 277 connections serving 210 private homes, 86 rental cottages, 30 business properties, such as stores, cafes, etc., and apartment units containing 56 apartments. According to the owner, gross receipts of the water system during the calendar year 1950 was $6,420.41. Operating expenses, not including the value of the owner’s services, was $1,669.37. The current charge for water service is $5.00 per quarter, for which 1500 cubic feet (11,250 gallons) is allowed. For the next 2000 cubic feet (15,000 gallons) the charge is 300 per hundred cubic feet, or 400 per thousand gallons. After the completion of the proj ect here described, the Town proposes to establish a monthly service charge for water of $2.00 per month, for which 3500 gallons will be allowed for the minimum bill. Water used in excess of this amount will be billed at the rate of 500 per thousand gallons. It is further proposed that a monthly sewer service charge will be made, such charge to be 50% of the monthly water bill. We anticipate that average monthly water consumption per .connection will amount to 4500 gallons. Such a consumption would result in an average annual charge per connection for water of $30.00. The sewer service charge would be 50% of this amount, or a total annual income for each water and sewer connection of $45.00. As there are now in the community approximately 350 individual properties with a favorable outlook for future growth, we believe each of the utilities will have not less than 300 connections by the end of the second year after completion and not less than 450 connections by the 26th year. It is further our opinion that the utilities can be operated for an amount not in excess of $16 annually per connection. On this basis, the operating expenses for the 5th year would be substantially as follows:
Superintendent-$2,400
Town Clerk (part time)_ 900
Extra Labor_ 720
Power_ 600
Repairs and maintenance_ 1, 380
Total_ 6,000
In the following exhibit there is presented the summarized estimates of the BFC [Representatives as to connections, gross revenues, operating expenses, net revenues and debt service.
*634 Proposed Water & Sewer System
Anticipated Operating Record — by RFC Representatives
Year Number of Gross con- revenues nec-Operating Net expenses revenues To be Debt raised service by taxation tions
1st [1].. [2] $9,400
2d_ 300 $13,500.00 $4,800.00 $8,700 9,400 $700.00
3d.. 325 14,625.00 5,200.00 9,425 13,400 3,975.00
4th.. 350 15,750.00 5,600.00 10,150 13,240 3,090.00
5th.. 375 16,875.00 6,000.00 10,875 13,080 2,205.00
6th-15th.. 400 18,000.00 6,400.00 11,600 [3]13,464 1,864.00
16th-25th. 425 19,125.00 6,800.00 12,325 [3]13,876 1,651.00
26th-35th. 450 20,250.00 7,200.00 13,050 [3] 10,084
Totals for 34 years. 634,500.00 225,600.00 408,900 432,760
Annual average. 18,661.76 6,635.29 12,026.47 12,728.24
The foregoing appraisal of the likely operating record of the proposed water and sewer utilities indicates that the net revenues received annually therefrom will be sufficient to pay the major portion of annual debt service. The balance necessary for this purpose can and will be raised by the levying of moderate ad valorem tases. As a matter of fact, the maximum tax levy will not likely exceed $1.00 per hundred dollars of tax valuation during the earlier years of the loan and lesser amounts appear possible annually thereafter. It is our opinion, therefore, that the securities offered will be so secured as reasonably to assure retirement in an orderly and satisfactory manner.
Based upon the findings of the North Carolina State Board of Health and upon our appraisal of the situation, the project is urgently needed to meet an essential civilian requirement. Its construction will require approximately 150 tons of cast iron pipe, 50 tons of steel plates and stractural steel, vitrified clay pipe, and negligible amounts of other metals and of miscellaneous building material, which are in short supply of varying degrees. The pattern of the current defense effort has not yet become readily apparent, but based upon the pattern of World War II, the Town of Kure Beach will be in a definite defense area in which chemical plants, shipbuild *635 ing yards and military camps and installations will predominate.
$ ^ ‡ ‡ ^
7. (a) On March 12, 1951, the RFC issued an authorization for the purchase of not more than $235,000 principal amount of general obligation water and sewer bonds of plaintiff.
(b) The general obligation bonds were to be issued as evidence of the loan. The principal and interest were to be paid primarily from unlimited ad valorem taxes on all of the taxable property within plaintiff’s corporate limits and from new revenues to be derived by plaintiff from the operation of the water and sewer systems.
(c) On September 10,1951, plaintiff’s town board adopted two ordinances authorizing the issuance, respectively, of water bonds in the sum of $110,000, and of sanitary sewer bonds in the sum of $150,000.[9]
(d) On October 23, 1951, at an election, a majority of plaintiff’s qualified voters approved both ordinances.
8. (a) On August 6, 1952, bids for construction of the water and sewer projects were found by plaintiff to be unacceptable, in that each one substantially exceeded the funds available under plaintiff’s arrangements with the RFC.
(b) New bids were received on August 29, 1952. Upon review of them, plaintiff deemed it apparent that, because of a general upward trend in construction costs, the proposed projects could not be financed for less than $260,000.
(e) In a resolution dated August 29, 1952, plaintiff requested the RFC to purchase obligations of plaintiff in the amount of $25,000 in addition to the loan of $235,000 previously applied for.
(d) On September 29,1952, the RFC issued an authorization for the purchase of general obligation water and sewer bonds of plaintiff in a principal amount of not more than $260,000.
(e) On November 25, 1952, by resolution of plaintiff’s-Board of Commissioners, the two bond issues described in *636 finding 7(c) were consolidated in one issue of “water and sewer bonds” in the principal amount of $260,000.
9. On or about January 5, 1953, the EFC purchased from plaintiff general obligation water and sewer bonds in the principal amount of $260,000' at a price equal to the principal amount thereof plus interest accrued thereon from the daté of the bonds, November 1,1952, to the date of their delivery to EFC. The bonds were in the denomination of $1,000 each, with interest at the rate of 4 percent' per annum, semiannually, and matured annually on May 1 in the- years and principal amounts as follows: ' ■■

Years Amounts Years Amounts

1955 $5, 000 •1972 $8,000
1956 5, 000 1973 8,000
1957 6,000 1974 8,000
1968 5, 000 1975 9,000
1959 5, 000 -1976 9,000
1960 5, 000 1977. 9,000
1961 5,000 1978 10, 000
1962 5, 000 1979 10,000
1963 5, 000 1980 11, 000
1964 5,000 1981 11,000
1965 6, 000 1982 11, 000
1966 6,000 1983 12,000
1967 6, 000 1984 12, 000
1968 7, 000 1985 12,000
1969 7, 000 1986 12,000
1970 7, 000 1987 12,000
1971 7,000
10. (a) The proceeds of the bond issue were applied by plaintiff (1) to the acquisition, improvement, and extension of a waterworks system and (2) to the construction of a sanitary sewer system.[10] The probable useful life of both systems was estimated to be 40 years.
(b) Both systems were located beneath the streets indicated on the map reproduced herein as Exhibit A. Title to the streets had been acquired by plaintiff through dedication prior to the installation of the water and sewer systems.
• (c) The systems were designed, financed, and constructed in reasonable anticipation of the projected growth of plaintiff within its then existing corporate limits, and to en *637 courage such, projected growth[11] to the extent hereinafter indicated.
HI
11. (a) Hurricanes battered Kure Beach in 1954,[12] in 1955,[13] and again in 1958,[14] causing severe damage, particularly Hurricane Hazel, in October 1954.[15] Army Engineers estimated the loss from Hurricane Hazel to be in excess of $500,000. Losses in 1955 were estimated at $115,200, and in 1958 at $212,600. On the basis of these estimates, hurricane damage to Kure Beach in the 5-year period 1954-1958 approximated one-half of the total value of its taxable properties.
(b) Kure Beach is situated on a bluff having an elevation of 14 to 20 feet, the highest coastal bluff south of Maryland. Due to this favorable location, damage to Kure Beach from the storms which struck the area directly was not as severe as was that to other small beach resorts nearby.[16]
(c) Kure Beach, like other resort areas severely hurt by this series of storms, repaired, rebuilt, and continued to draw resort residents and trade. The conclusion is warranted by the evidence as a whole that the growth of the town would *638 have continued, in spite of setbacks by hurricane damage, if its area of potential expansion had not been curtailed by the taking for the safety buffer zone of the Sunny Point Terminal.
IV
12. (a) The first development of the Town of Kure Beach was begun sometime prior to 1945. By the time of the incorporation of the municipality in 1947, buildings extended along Atlantic Avenue, facing the beach, and inland to Third Avenue. In 1950 some construction was begun between Third and Fifth Avenues. From 1951 to 1955 a total of 105 houses were built: 42 east of Third Avenue; 40 west of Third and east of Fifth Avenues; 23 west of Fifth Avenue and east of Ninth Avenue.
(b) By 1955, most of the area east of Seventh Avenue was served by streets, water lines, and sewer lines. All of the improved properties west of Seventh Avenue (which were east of Ninth Avenue) were served by water lines, but not all of these properties were served by sewer lines. No streets of any consequence were open west of Ninth Avenue.
(c) Early in 1955, Mr. Kure, owner of the undeveloped land west of Ninth Avenue, had a plat made of the streets west of Ninth Avenue as far as Thirteenth Avenue.[17] In May of 1955, he engaged a contractor to clear the dedicated portions of the streets in this area. After 3 days of bulldozing, the work was halted, because of notice from the Army of its intention to establish a safety buffer zone which would require the acquisition by it of the area being worked.
(d) The notice described in the preceding paragraph was the first knowledge had by the officials and residents of the town of the Army’s plans to extend the buffer zone east of the Cape Fear River and into the corporate limits of the municipality.
13. (a) Plans for the Sunny Point Army Terminal project, as an ammunition loading point with piers and vessel berths on the west bank of the Cape Fear River, were initiated in 1950. Funds for the project were authorized by Congress *639 on November 1, 1951, and on the next day the Army issued to its Chief of Engineers a real estate directive for the acquisition of fee simple title to 20,200 acres of land in Brunswick County, North Carolina, on the west bank of the Cape Fear River.
(b) Vessels were to be loaded with ammunition from piers on the west bank of the Cape Fear River. On December 6, 1951, the Army’s Chief of Ordnance advised its Chief of Engineers that where civilians and private property were exposed, the distance from the ammunition loading site to the limit of military control for proper safety purposes should be based upon empirical coefficients not less than those derived from the American Table of Distances. For the Sunny Point Terminal, he recommended that the distance to the limit of military control should be based upon an empirical coefficient of K=70,[18] representing a radius of 13,391 feet.
(c) From December 6, 1951, to May 10, 1955, the extent of the buffer zone, in terms of the distance to the limit of military control, was under discussion and debate within the Army command. Some officers believed that a coefficient of K=30 or K=50 would suffice. Others were committed to the K=70 which ultimately prevailed when the Deputy Assistant Secretary of the Army issued a real estate directive on that basis, thereby covering the acquisition of fee simple title to land on the peninsula (between the Cape Fear River and the Atlantic Ocean) including the portion within plaintiff’s corporate limits delineated by the heavy line on the map reproduced herein as Exhibit A.
(d) While the extent of the buffer zone was under consideration by the Army, no word of the plans under discussion or their possible effect on owners of land on the peninsula was communicated to plaintiff’s officials or to the RFC.
14. (a) On October 17, 1955, plaintiff advised the RFC that defendant was establishing a safety buffer zone around the Sunny Point Army Terminal; that plaintiff would lose *640 the potential of all adjacent undeveloped property, some developed property, some water and sewer mains, and some streets; and that plaintiff would do all in its power to pror tect tbe financial structure of the town and, thereby, the interest of the RFC as the holder of plaintiff’s bonds.
' (b) On December 29, 1955, the Army’s Chief of Engineers advised the RFC that defendant’s acquisition of land for the safety buffer zone would curtail the water and sewer facilities of the town since the furnishing of such facilities wordd no longer be required in the areas west of Seventh Avenue and north of Avenue I, and west of Sixth Avenue and south of Avenue I.
15. (a) As of January 1,1956', the United States acquired the buffer zone land lying within plaintiff’s corporate limits as hereinabove described.[19] Some of the acquisitions were by direct purchase and some were by declarations of taking filed in condemnation proceedings. In each instance, the acquisition described the estate taken as follows:
Fee simple title thereto, subject, however, to existing easements for public roads and highways, public utilities, railroads and pipelines.
(b) None of the land to which defendant acquired fee simple title belonged to plaintiff. One small tract on the Cape Fear River, owned by plaintiff, was excluded from the acquisition in order that it might remain available to plaintiff as the site of a potential sewage treatment plant.[20] It was subjected to a restrictive easement prohibiting human habitation and reserving to defendant the right to prohibit gatherings of more than 25 persons. Subject to these restrictions, the site remains available to plaintiff for a sewage treatment plant. The value of the easement so imposed has been reserved in a condemnation proceeding and is not at issue in this case.
*641 V
16. (a) At the time of the taking, there were, within the corporate limits of Kure Beach, some open land extending from the Cape Fear Biver eastward to Thirteenth Avenue, and 1,142 building lots, of which 186 lay between Thirteenth Avenue and Ninth Avenue, as shown on a subdivision map prepared in 1955 and filed for record on March 7, 1956. The 186 lots were unimproved. In addition to them there were 525 other unimproved lots, making the total in this category Ill. The remaining 431 (of the 1,142) lots were improved.
(b) In taking the land (approximately described as west of Seventh Avenue north of Avenue T, and west of Sixth Avenue south of Avenue I) defendant acquired the unplatted land west of Thirteenth Avenue, the 186 unimproved lots between Thirteenth and Ninth Avenues, and 160 lots east of Ninth Avenue, for a total of 346 lots. Altogether, defendant’s acquisitions constituted approximately 40 percent of the land area within plaintiff’s corporate limits.
(c) Of the 346 lots taken by defendant, 321 were unimproved and 25 were improved. The 26 dwellings on lots acquired by defendant were either demolished or removed, leaving defendant in possession of 346 lots without buildings on them. By reason of the removal of some of the dwellings to unimproved lots east of the line of taking, there were left to the municipality the potential of 362 vacant lots as compared with the former Ill.
(d) The taking resulted in the removal from plaintiff’s tax rolls of property valued at $28,455, and a loss in annual tax revenue of $540.
(e) The taking by defendant of improved properties also deprived plaintiff of 26 water connections and 14 sewer connections,[21] resulting in an annual loss of charges for these utilities of $1,060.
*642 17. (a) Within the area taken by defendant were 1.17 miles of plaintiff’s streets, of which 702.5 feet were rough graded only,[22] while 5,512.5 feet had been graded, surfaced with clay, and provided with drainage.[23]
(b) Underneath some of these streets were portions of plaintiff’s water and sewer systems, consisting of pipes,[24] valves,[25] valve boxes,[26] hydrants,[27] meters,[28] manholes,[29] and other appurtenances.[30]
(c) Estimates of the value of the streets and underlying facilities above-described were as follows:
For the streets: (1) $8,047.60; (2) $12,103.13.[31]
For the water system: (1) $6,476.00; (2) $7,113.42.[32]
For the sewer system: (1) $3,001.00; (2) $4,291.54.[33]
18. (a) Total assessed property valuations are shown below, from 1947 (when plaintiff was incorporated) through 1955:

Tear Assessed valuation

1947_ $332,604
1948_ 365, 684
1949_ 460, 799
1950_ 505, 941
1951_ 536, 814
1952_ 588,383
1953_ 635,130
1954_ 665, 543
1955_ 647,967 (Hurricane Hazel)
(b) During the period commencing 1948 and terminating 1956, plaintiff’s property valuation for ad valorem taxation increased at an average rate of 10.597 percent per year. Since the taking of the buffer zone, in 1956, the average annual in *643 crease in property valuation has been at the rate of 3.214 percent.
19. (a) In 1953 when the water and sewer systems were installed, engineers for the BFC estimated the number of water connections to be anticipated as follows:

Year Connections (estimated)

2d_300
3d_325
4tli_350
5th_375
6tb-15tb_400
16th-25th_425
26tb-30tb_450
(b) Actual water connections were as follows:

Sate Connections

Starting — 1953_ 331
December 1953[34]_ 349
December 1954 [35]_ 353
December 1955[36]_ 359
1962[37]_ 389
(c) The operating record of plaintiff’s water and sewer systems has failed to equal the operating record contemplated by the BFC.[38] As a consequence, plaintiff has had to raise substantial additional sums by tax levies with which to meet its obligations on its bonded indebtedness.[39]
20. (a) By letter dated March 28, 1956, the BFC advised the Army’s Chief of Engineers of its concern over the effect *644 of the taking of the buffer zone on the revenue potential of plaintiff. Following are excerpts from the letter:
At the time this loan was authorized, there was no indication that any of the territory within the corporate limits of Kure Beach would be required for defense activity and our evaluation of the soundness of the water and sewer obligations purchased by R.F.C. was based on the town’s ability to pay, plus unrestricted possibilities for growth and development of the entire area. The assessed valuation of the town, has increased an average of 10.7 % per year for the eight years prior to 1955. There was some loss in valuation in 1955 due to “Hurricane Hazel” but because of the higher elevation at Kure Beach, the damage there was not proportionately as severe as at Carolina Beach and other beaches nearby, and the rate of recovery and rebuilding therefor has been faster at Kure Beach.
* * * # ❖
We believe it is apparent that the acquisition of this safety zone will restrict the town’s growth, will materially reduce the collateral supporting the Kure Beach bonds, held by this corporation, and will seriously impair the ability of the town to meet its obligations. As a matter of fact, it is our present estimate that the taking of the buffer zone as presently delineated will impair the collateral value of the bonds by approximately 40%, or about $100,000.
In view of the foregoing, it is our opinion that your department should include in its cost of the acquisition of the buffer zone the amount by which the collateral value of our bonds would be impaired and such amount paid to this corporation for the benefit of the town so that bonds in an equivalent amount can be retired. * * *
(b) The Army replied that it was without authority to comply with the RFC suggestion.
(c) On the basis of the comment by the RFC in its letter to the Army, plaintiff has requested findings as follows:
(1) The acquisition of the safety buffer zone by the defendant restricted plaintiff’s growth, reduced the collateral supporting its obligations held by Reconstruction Finance Corporation by approximately 40% or $100,000, and seriously impaired the plaintiff’s ability to meet its obligations.
*645 (2) As a result of the severance of the property referred to herein,' the value of the plaintiff’s water and sanitary sewer systems lying within the portion of plaintiff’s corporate limits not taken and condemned by the defendant, has been reduced, and the plaintiff thereby damaged, to the extent of $104,000.
21. Following are the elements of loss for which plaintiff seeks compensation by this proceeding:

Items Amount

Streets[40]_■____ $12,101.13
Water lines [41]_■_ 7,213. 63
Sewer lines[42]-: — --:- 4, 291. 64
Revenues from water and sewer lines[43]_ 32, 860.00
Revenues from ad valorem taxes[44]_ 16, 740. 00
Severance damage[45]_ 104, 000.00
Total____$177,206.20
VI
22. (a) Defendant did not take or acquire fee simple title to any land or utilities owned by plaintiff.[46]
(b) Defendant’s acquisitions nevertheless effectively deprived plaintiff (1) of the value of the streets within the condemned area and of the utilities under those streets; (2) of the revenues then available from ad valorem taxes on the properties within the condemned area and from service charges for the utilities in use in the area; and (3) of the potential of growth within the portion of its corporate limits acquired by defendant.
(c) The values set forth in finding 21 for the elements therein described are reasonable values.

The tests of H. Res. 470 and of H.R. 10919 (referred to this court by H. Res. 470), 86th Cong., 2d Sess., are set forth in the findings. Authority for the reference is contained in 28 U.S.C. §§ 1492, 2509.

 Virtually all of the -work in preparation of this case had been completed by the parties prior to the decision by the Supreme Court of Glidden Co. v. Zdanok, 370 U.S. 530 (1962).

 These distances were derived from a technical formula described as K=30, K=50, and K=70, wherein K (distance) was equal to 30, 50, or 70 times the cube root of the pounds of explosives at a given point.

 The united States had contracted with plaintiff for the latter to relocate or abandon in place certain of its facilities and also to transfer to the united States its interest in some of its rights-of-way and easements. In this manner the united States paid plaintiff for the reasonable value of facilities, rights-of-way, and easements or franchise rights located in and under the dam. site and its' appurtenant embankments, diversion channels, spillways, and outlet works.

 261 U.S. 502, 611.

 Moreover, the purpose of condemnation proceedings is to pay just compensation for the taking of private property for public use.

 In Bnrlchardt the court said (113 Gt. Cl. 669) : *** * * whether these * * * plaintiffs are to be compensated by the Government for the taking of their property is a matter exclusively for the determination of Congress.”

 B Amusement Company et al. v. United States, supra.

 H, Res. 470 was introduced in the House of Representatives on March S, 1960, and was passed on April 19,1960.

 H.R. 10919 was introduced in the House of Representatives on March 7, 1960.

 Following the completion of discovery, pretrial proceedings were Initiated in February 1962,, and were completed in August. As a result of these proceedings the parties agreed upon virtually all of the documentary evidence and stipulated voluminous background facts, thereby obviating the need for testimony on issues other than valuation.

 The best estimate of the permanent population of the town at times material here is about 400 people. Local estimates ran as high as 1,000. Census reports gave the figure in 1950 as 228 and in 1960 as 293.

 Incorporation was effective on April 5, 1947, by virtue of an Act of the General Assembly of North Carolina (N.C. Sess. Laws, 1947, ch. 906).

 N.C. Sess. Laws, 1947, ch. 906, and chapter 160 of the General Statutes of North Carolina.

 Following is the text of the order:
Whereas, the North Carolina State Board of Health finds:
That, the Town of Knre Beach, North Carolina is not provided with an adequate sewerage collection and disposal system, and
That, extreme nuisance conditions have arisen because of insanitary privies, unsatisfactory septic tank installations and other inadequate facilities for the disposal of liquid waste, and
That, the use of these insanitary facilities, especially in such a congested area as the Town of Kure Beach and the surrounding territory, is dangerous to the public health, and is jeopardizing the safety of the bathing beaches bordering the Town, and
Whereas, the North Carolina State Board of Health deems it expedient and necessary for the prevention of nuisances and the protection of the public health that the Town of Kure Beach install, maintain and operate an adequate sewage collection system to correct this situation.
Now, therefore, it is ordered by the State Board of Health :
That, the Town of Kure Beach, North'Carolina, proceed forthwith to construct and put into operation an adequate system of sanitary sewers, and
That, the Town of Kure Beach, without unnecessary delay, secure final plans and specifications and submit them to this Board for approval and have the sewer system improvements placed in operation, under suitable supervision, as soon as possible thereafter.

 Mr. Kure was then mayor of the town, which was named for him.

 Construction and development period.

 1st year's interest to be paid from Bond Proceeds and current revenues.

 Average.

 The increased amount ($260,000, as compared to $235,000) represented* anticipation of the difficulties hereinafter outlined.

 The water system was acquired by plaintiff in February 1953. Improvements to tbe system were completed 2 or 3 months later and the sewer system was completed about August- 1, 1.953. Connections of potential users were substantially achieved by September 1, 1954.

 Tie parties iave stipulated as follows:
(1) “George Cannoutas, present Mayor of tie Town of Kure Beach * * *, if called as a witness, would testify that the * * * water and sewer systems in fact did encourage such growth.”
(2) “In December of 1953, A. K. Maddox, Loan Examiner of the Public Agency Division of the R.E.C. was of the opinion that the outlook for the liquidation of the bonded Indebtedness by the plaintiff was more favorable, if anything, than in the past.”
(3) “In September of 1954, A. K. Maddox * * * .regarded the outlook of the plaintiff as favorable for the continuation of the rate of growth and population and building, and was of the opinion that the net operating results of the plaintiff’s water and sewer system would increase in future years. He further regarded * * * [the] systems as largely self liquidating and felt that annual tax levies, to make up the difference between annual net revenues and annual debt service, would likely be moderate.”

 Hurricane Hazel, October 15, 1954.

 Hurricane Connie, August 11, 1955; Hurricane Diane, August 16, 1955; and Hurricane lone, September 19, 1955.

 Hurricane Helene, September 27, 1958.

 ■<* * * qijjjg hurricane destroyed approximately fifty buildings; washed out three blocks of First [Atlantic] Avenue, as well as practically destroying the fishing pier and the concrete sea wall. It also washed out approximately 3,000 feet of two-inch water main and one block of eight-inch sewer main, together with the house connections, etc. * * *” Engineering and Finance Report, RFC, dated March 8, 1956.

 Carolina Beach was almost totally destroyed by Hurricane Hazel.

 Numbered avenues ran north and south. At right angles, running east and west, were lettered avenues.

 “K^TO” meant that the distance in feet should be 70 times the cube root of the net weight ofl the explosives.

 At the same time defendant acquired areas along the east bank of the Cape Fear River, north and south of plaintiff’s corporate limits and tvest of communities which were plaintiff’s nearest neighbors, thereby destroying such neighbors’ access to the Cape Fear River.

 The outfall of plaintiff’s sewer system runs underneath H Avenue and through this site to the Cape Fear River. Defendant’s acquisition has not interfered with this outfall.

 The water and sewer lines were laid to serve all properties east of Seventh Avenue, and some properties west of Seventh Avenue. Otherwise, additional mains would have had to be laid to serve some of the properties between Seventh and Ninth Avenues and all properties west of Ninth Avenue.

 The clearing opened a right-of-way 50 feet wide.

 The right-of-way was 50 feet wide, the roadbed SO feet wide, and the surfacing 20 feet wide and 6 inches deep.

 There were 4,515 feet of pipe, ranging in size from %-inch to S-inch pipe for the water system, and 4-inch to 8-ineh mains for the sewer system.

 There were 11 valves, ranging in size from %-inch to S'inches.

 There were 11 valve boxes.

 There were 2 hydrants.

 There were 2,6 meters.

 There were 4 cleanouts.

 Included were 14 sewer service connections, each 26 feet long.

 The figure adopted by plaintiff is $12,101.13.

 The figure adopted by plaintiff is $7,213.53.

 The figure adopted by plaintiff is $4,291.54.

 It is apparent from the 1953 figures that the RFC estimate was conservative.

 This was the end of the second year, showing 349 actual connections as compared with 300 estimated. Hurricane Hazel had intervened in October 1954.

 This was the end of the third year. The increase, from starting, had been 27 as compared with 25 estimated.

 In the 9th year, actual connections were 11 short of the number projected for the end of the 15th year.

 Defendant challenges the validity of this statement, contending that the evidence fails to show that plaintiff maintained charges for water and sewer service as contemplated by the RFC. The contention is not well-founded. The statements of plaintiff’s financial condition (in evidence) indicate maintenance of the contemplated rate.

 The excess in 1961 was of the order of $20,000.

 See finding 17(c).

 See finding 17(c).

 See finding 17 (c).’

 This represents a projection for 31 years of the annual loss of $1,060 in revenues from utilities. See finding 16(e).

 This represents a projection for 31 years of the annual loss of tax revenue. See finding 16(d).

 See finding 20(e).

 Cf. finding 15(a). The open land and platted lots within plaintiff’s corporate limits were acquired in fee simple title, “* * * subject, however, to existing easements for public roads and highways, public utilities, railroads, and pipelines.”